*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0024P (6th Cir.)
File Name: 03a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

VENCOR, INC., d/b/a Vencor
Kentucky, Inc., d/b/a Vencor
Hospital-Louisville and d/b/a
Vencor Hospital-Chattanooga,
       *Plaintiff-Appellant,*

      *v.*

STANDARD LIFE AND
ACCIDENT INSURANCE
COMPANY,
       *Defendant-Appellee.*

No. 01-5435

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00020—John G. Heyburn II, Chief District Judge.

Argued: August 6, 2002

Decided and Filed: January 21, 2003

Before: MOORE and GILMAN, Circuit Judges; ROSEN,
District Judge.[*]

—————————————

[*]The Honorable Gerald E. Rosen, United States District Judge for the
Eastern District of Michigan, sitting by designation.

1

---

**COUNSEL**

**ARGUED:**  Bradley L. Kelly, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, Washington, D.C., for Appellant.  Richard J. Kilmartin, KNIGHT, BOLAND & RIORDAN, San Francisco, California, for Appellee. **ON BRIEF:**  Bradley L. Kelly, Laura J. Oberbroeckling, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, Washington, D.C., K. Gregory Haynes, WYATT, TARRANT & COMBS, Louisville, Kentucky, for Appellant.  Richard J. Kilmartin, Samuel G. Ware, KNIGHT, BOLAND & RIORDAN, San Francisco, California, for Appellee.

ROSEN, D. J., delivered the opinion of the court, in which GILMAN, J., joined.  MOORE, J. (pp. 26-31), delivered a separate dissenting opinion.

---

**OPINION**

---

ROSEN, District Judge.

### I.  *INTRODUCTION*

Plaintiff/Appellant, Vencor, Inc., d/b/a Vencor Kentucky, Inc., d/b/a Vencor Hospital-Louisville and d/b/a Vencor Hospital-Chattanooga ("Vencor"), appeals two orders of the District Court for the Western District of Kentucky granting summary judgment to Defendant/Appellee Standard Life and Accident Insurance Company ("Standard Life") in this breach of contract/promissory estoppel action.  Specifically, Vencor seeks to recover the balances it claims it is owed by Standard Life for hospital services provided to two patients, Mac Weaks and Mildred Hollow.  Both Mr. Weaks and Mrs. Hollow were covered by Medicare supplement ("Medigap") insurance policies issued by Standard Life.

appears in the Medicare Act as well — in reference to items and services.  42 U.S.C. § 1395y(a)(1)(A).[2]

I believe that the contract term "Medicare eligible expense" as used in the Weaks and Hollow Medigap insurance policies is ambiguous.  If contract language is ambiguous and "the ambiguous language limits the coverage of an insurance policy, that language must be construed against the insurance company and in favor of the insured." *American Justice*, 15 S.W.3d at 815.  To construe "Medicare eligible expense" to refer to the rate Medicare pays would limit the coverage of the Weaks and Hollow Medigap insurance policies.  Therefore, I also believe that this court must construe the term "Medicare eligible expense" to refer to the kind of expense Medicare pays for, and I respectfully dissent.

---

[2]The Eleventh Circuit read the "reasonable and necessary" portion of this provision to modify "expenses" as opposed to "items or services." *Vencor*, 284 F.3d at 1182 n.10.  As I explained above, however, the "reasonable and necessary" portion of this provision modifies "items or services."

Medigap insurance regulations promulgated by the Tennessee Department of Commerce and Insurance suffers from the same inherent ambiguity as the definition of "Medicare Eligible Expense" in the Weaks and Hollow policies. *See* Tenn. Comp. R. & Regs. tit. 0780, ch. 1-58-.05(1)(g) (2001) ("Medicare Eligible Expenses shall mean expenses of the kinds covered by Medicare, to the extent recognized as reasonable and medically necessary by Medicare.").

I recognize that other courts have addressed this issue and concluded that the term "Medicare eligible expense" unambiguously refers to the rate Medicare pays. In particular, the Eleventh Circuit assessed a similar Medigap insurance contract in a similar case and concluded that the term "Medicare Eligible Expenses" unambiguously limited the insurance company's coverage to the per diem rate Medicare had paid prior to the exhaustion of the insured's Medicare benefits. *See Vencor Hosps. v. Blue Cross Blue Shield ("BCBS") of Rhode Island*, 284 F.3d 1174 (11th Cir. 2002). The contract in that case defined "Medicare Eligible Expenses" as "the health care expenses covered under Medicare which Medicare has determined are reasonable and medically necessary." *Id*. at 1176. The court reasoned that "[t]he crucial word in the disputed term is 'expense.' Vencor contends that this word refers to types of services only. BCBS argues that 'expense' refers to cost amounts for services. The dictionaries that the Court has reviewed are consistent in their collectively defining 'expense' to refer to cost." *Id*. at 1181. Therefore, the court held that "'Medica[re] Eligible Expenses' can only refer to costs that would be eligible for payment under Medicare." *Id*. at 1181-82. The court also noted that if "reasonable" did not refer to costs, it would be redundant with "medically necessary." *Id*. at 1182. I find this reasoning unpersuasive. Even if the word "cost" were substituted for the word "expense," "reasonable health care cost" could still refer either to a type of cost or to an amount of cost. Although there does appear to be some redundancy or contradiction in the use of both "reasonable" and "medically necessary," the combined usage of these terms

At issue in this appeal is the amount Standard Life was required to pay Vencor for Mr. Weaks's and Mrs. Hollow's medical care after their Medicare Part A benefits were exhausted. Vencor claims that, under the terms of the insurance policies, after Mr. Weaks's and Mrs. Hollow's Medicare Part A benefits were exhausted, Standard Life was required to pay Vencor its standard rates. Standard Life, on the other hand, contends that it is obligated to pay Vencor only the per diem rates allowed by Medicare, even after Medicare coverage has been exhausted.

The District Court agreed with Standard Life and, accordingly, entered summary judgment in its favor on both the breach of contract and promissory estoppel claims. Vencor timely appealed. For the reasons set forth below, we affirm the judgment of the District Court.

## II.  *FACTUAL BACKGROUND*

### A.  *MEDICARE PART A COVERAGE*

The Medicare Act, 42 U.S.C. § 1395 *et seq*., provides health insurance for the aged and disabled. The Medicare program consists of two parts. Medicare Part A -- the relevant program in this case -- covers services provided to hospitalized patients.[1] Medicare Part A covers expenses for ninety days for each "spell of illness." *See* 42 U.S.C. § 1395d(a)(1). When a "spell of illness" is broken by a period of sixty days during which a patient is not hospitalized, a new period of ninety days commences. *Id.; see also* 42 U.S.C. § 1395x(a). Medicare also allows for coverage of sixty additional life-time reserve days. *See* 42 C.F.R. § 409.61(a)(2). These reserve days are non-renewable. *Id.* The life-time reserve days can be used at any time; however, once they are used they are gone.

---

[1] Part B covers other medical expenses, including physicians' fees, therapies, and supplies. *See* 42 U.S.C. § 1395j.

In addition to limiting the time of coverage, Part A also limits the types of services that are covered. The services that are covered include room and board, nursing services, drugs, supplies, and other diagnostic and therapeutic items or services furnished to inpatients. *See* 42 U.S.C. § 1395x(b); *see also* 42 C.F.R. § 412.23(c). Of these covered expenses, Medicare is further limited in that expenses will be covered only if they are reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A).

Vencor, an operator of long-term hospital care facilities,[2] accepts assignment of Part A Medicare benefits from its patients. Medicare pays Vencor the lesser of the reasonable cost of its services or its customary charges, *see* 42 U.S.C. § 1395f(b)(1), pursuant to the Reasonable Cost Reimbursement System ("RCRS"). *See* 42 C.F.R. § 413. Under the RCRS, Medicare makes interim payments to Vencor subject to a year-end adjustment. 42 C.F.R. § 413.1(a)(1)(A). These interim payments are calculated on the basis of a per diem rate for each Medicare patient/beneficiary, which is derived by dividing the hospital's "allowable net Medicare inpatient operating costs" in a base year by the number of Medicare beneficiaries in that year. *See* 42 C.F.R. § 413.40(a)(3)(D).

Medicare, however, does not cover the full per diem rate.[3] During the first sixty days of hospitalization, Medicare covers all allowable costs, excluding a deductible. From the 61st to 90th days of hospitalization, Medicare pays the full amount of allowable costs, less a coinsurance amount for which the patient is responsible. During the sixty reserve days, Medicare pays the full amount of allowable costs, less a

---

[2]Vencor provides long-term health care pursuant to 42 C.F.R. § 412.23(c).

[3]*See, e.g.*, Notice, 57 Fed. Reg. 37,980 at 37,983-37,985 (Aug. 21, 1992).

benefit "gaps" in Part B of the Medicare Act, the policies state in pertinent part that:

> PART B BENEFIT. . . . The benefit will be equal to the difference between the Medicare eligible expense you incur and what Medicare pays . . . . If you are not covered under Part B of Medicare, Standard Life will determine Medicare eligible expense and what Medicare would have paid as if you were covered under Part B of Medicare.

J.A. at 132, 136. Thus, at least one clause in the policies does distinguish between a "Medicare eligible expense" and the amount Medicare actually pays. Also, in regard to coverage for "Additional Nursing Facility Benefits," the policies state that: "the daily benefit will be equal to the expense you incur not to exceed an amount equal to the daily benefit that would have been paid under this policy for the 21st through the 100th days of a Medicare approved stay." J.A. at 132, 136. This clause suggests that had Standard Life intended to limit its payment for inpatient hospitalization expenses incurred after the insureds' exhaustion of Medicare benefits, it would have so specified. Therefore, I do not believe that reading "Medicare eligible expense" in the context of the entire contract resolves its inherent ambiguity.

Finally, neither the Medicare Act nor its accompanying regulations support a single interpretation of "Medicare eligible expense." As I note above, *see infra* note 1, the Medicare Act in at least one instance describes items and services as "reasonable and necessary," 42 U.S.C. § 1395y(a)(1)(A), although the regulations consistently refer to "costs recognized as reasonable." *See, e.g.*, 42 C.F.R. § 413.30(a)(1) ("This section implements section 1861(v)(1)(A) [codified at 42 U.S.C. § 1395x(v)] of the Act by setting forth the general rules under which CMS may establish limits on SNF and HHA costs recognized as reasonable in determining Medicare program payments."). And the definition of "Medicare Eligible Expenses" in the

Therefore, "Medicare eligible expense" could mean a kind of expense Medicare could pay for that was incurred in circumstances in which Medicare would have paid for it.

Moreover, the ambiguity of "Medicare eligible expense" is not resolved in the context of the rest of the policy. The district court posited that because the use of "Medicare eligible expense" in Standard Life's explanation of its coverage referred to the amount of money Standard Life would pay prior to the insureds' exhaustion of their Medicare benefits, "Medicare eligible expense" must also refer to the amount of money Standard Life would pay after the insureds had exhausted their Medicare benefits. J.A. at 525-26 (9/13/99 Op.). In regard to pre-exhaustion coverage, the polices state that:

> PART A BENEFIT. . . . The benefit for each benefit period will be equal to the Medicare eligible expense you incur for a) the Part A inpatient hospital deductible if the application shows Plan 1 or Plan 2 was selected; b) the Part A hospital coinsurance amounts beginning with your 61st day of hospital confinement . . . .

J.A. at 132; 136. Although it is true that, pursuant to this clause, Standard Life was only required to pay specific, limited amounts for its insureds' deductibles and coinsurance payments, those amounts were limited because the *insureds* could not statutorily incur more than a certain amount for the deductible and coinsurance payments. *See* 42 U.S.C. § 1395e. Nothing in the policies themselves limits the amount Standard Life would need to pay for the deductibles and coinsurance payments.

Other parts of the policy also support Vencor's reading of "Medicare eligible expense." In regard to coverage for

---

contract to the extent Medicare would view the items or services as reasonable and necessary for the diagnosis or treatment of illness or injury.

higher coinsurance amount, for which the patient is also responsible. 42 U.S.C. § 1395e(a)(1). After Part A benefits have expired, hospital patients can no longer rely on Medicare to cover their hospitalization expenses.

Because Medicare does not cover all of the health care costs of its beneficiaries, Medicare beneficiaries can obtain supplemental insurance to fill in the "gaps," commonly known as "Medigap" insurance. Medigap insurance policies typically cover the initial deductible and coinsurance rates, as well as expenses after Part A benefits have been exhausted. Standard Life provides various forms of insurance in Kentucky and Tennessee, including Medigap insurance policies as described above.

**B.    *PERTINENT    PROVISIONS    OF    THE
        STANDARD   LIFE   MEDIGAP   POLICIES   AT
        ISSUE IN THIS CASE***

Standard Life issued Mac Weaks a Medigap insurance policy on January 25, 1991, and, on June 28, 1991, Standard Life issued an identical policy to Mildred Hollow. Both policies were issued in the State of Tennessee. Both the Weaks and Hollow policies contain the following language and definition of "Medicare eligible expenses":

> 'Medicare Eligible Expense' means health care expense of the kind covered by Medicare to the extent recognized as reasonable by Medicare.

[*See* Standard Life's Weaks and Hollow policies, § 3, J.A. pp. 132, 136].

Hospitalization coverage is set forth in the following policy provisions:

> PART A BENEFIT. Standard Life will pay a benefit to supplement Part A of Medicare when you incur expenses as a result of injury or sickness. The benefit for each benefit period will be equal to the Medicare eligible

expense you incur for the Part A hospital coinsurance amounts beginning with your 61st day of hospital confinement. . . .

If you are confined in a hospital for at least 90 days in a benefit period and have used all your lifetime reserve days, Standard Life will pay a benefit for each day of the continued confinement, subject to a lifetime maximum of 365 days. The daily benefit will be equal to 100% of the Medicare eligible expense you incur.

If you are not covered under Part A of Medicare, Standard Life will pay a benefit as if you were covered under Part A of Medicare.

*Id.*

Mr. Weaks was hospitalized at Vencor Hospital-Louisville beginning on March 21, 1996 until his death on August 6, 1996. Pursuant to Medicare guidelines, Mr. Weaks's Part A Medicare benefits expired on June 15, 1996. As of June 1, 1996, the allowable per diem rate was $800 at Vencor Hospital Louisville. From March 21, 1996 to June 15, 1996, Medicare paid a portion of the per diem rate and Standard Life paid the remaining amount, pursuant to Mr. Weaks's Medigap insurance policy with Standard Life. From June 16, 1996 to August 6, 1996 (the hospitalization period post-Medicare Part A exhaustion), Standard Life paid the entire per diem rate of $800.

Mrs. Hollow was hospitalized at Vencor Hospital-Chattanooga beginning on January 3, 1996 until her death on September 18, 1996. Mrs. Hollow's Medicare Part A benefits expired on March 31, 1996. While Mrs. Hollow was covered under Medicare Part A, the allowable per diem rate at Vencor's Chattanooga facility was $900. From January 3, 1996 to March 31, 1996, Medicare paid a portion of the per diem amount and Standard Life paid the remaining amount pursuant to Mrs. Hollow's Medigap insurance policy. From April 1, 1996 to September 18, 1996 (the

insurance policy is susceptible of more than one reasonable interpretation . . . it is ambiguous." *American Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 815 (Tenn. 2000).

On its face, the term "Medicare eligible expense" as defined by the Weaks and Hollow policies is susceptible of more than one reasonable interpretation. *See also* J.A. at 525 (9/13/99 Op.) ("[v]iewed in isolation, Vencor's analysis offers a plausible interpretation of 'Medicare eligible expenses'"). In the sentence "'Medicare Eligible Expense' means health care expense of the kind covered by Medicare to the extent recognized as reasonable by Medicare," J.A. at 132; 136, "to the extent recognized as reasonable" could either modify "expense" or "kind." If it modifies the latter, it could be referring to the circumstances in which Medicare would pay for a particular kind of expense. For instance, Vencor states that "[a] semi-private room is the kind of hospital expense that Part A recognizes as being reasonable in the case of an acutely-ill, bed-bound patient. A semi-private room, while the kind of expense that Part A often will pay, is not a reasonable expense for a patient who can be treated on an outpatient basis and sent home." Appellant's Br. at 32-33.[1]

---

[1] In regard to this example, the district court noted that "Vencor is right — a semi-private room may be 'reasonable' in one circumstance and not in another. However, Vencor's assertion that in all circumstances it would be the '*kind* of expense covered by Medicare' is simply not true. Section 1395y(a)(1)(A) would preclude it from coverage if it were not medically reasonable and necessary." J.A. at 527 n.10. 42 U.S.C. § 1395y(a)(1)(A) provides that no Medicare payment may be made "for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ."

This provision, however, does not specifically define the "kind" of expenses Medicare covers. In fact, the provision supports Vencor's reading of the definition of "Medicare eligible expense." If "of the kind covered by Medicare" refers to the expenses generally covered in the Medicare Act, then "to the extent recognized as reasonable by Medicare" could actually refer to this exclusion provision. In other words, the term could be interpreted to mean that expenses for items or services covered by Medicare (of the kind covered by Medicare) are covered by the

_____

### DISSENT

_____

KAREN NELSON MOORE, Circuit Judge, dissenting. The majority concludes that the term "Medicare eligible expense," as used in Mac Weaks's and Mildred Hollow's Medigap insurance policies, unambiguously limits Standard Life's liability for Weaks's and Hollow's inpatient hospitalization following the exhaustion of their Medicare benefits to the per diem rate Medicare paid for their inpatient hospitalization prior to the exhaustion of their Medicare benefits. Because I believe that the term "Medicare eligible expense" is ambiguous in the policies, I respectfully dissent.

The Weaks and Hollow insurance policies provide:

PART A BENEFIT. . . . If you are confined in a hospital for at least 90 days in a benefit period and have used all your lifetime reserve days, Standard Life will pay a benefit for each day of your continued confinement, subject to a lifetime maximum of 365 days. The daily benefit will be equal to 100% of the Medicare eligible expense you incur.

J.A. at 132 (Weaks Policy); 136 (Hollow Policy). As the majority explains, the policies state that "'Medicare Eligible Expense' means health care expense of the kind covered by Medicare to the extent recognized as reasonable by Medicare." J.A. at 132; 136. According to Standard Life, this language unambiguously means that, following the insured's exhaustion of his or her Medicare benefits, Standard Life is only required to pay the hospital the per diem rate that Medicare would have paid the hospital. Vencor contends, however, that this language instead could mean that Standard Life is only required to pay the hospital for the types of expenses for which Medicare would have paid — but at the standard rate. Under Tennessee law, "[w]here language in an

hospitalization period post-Medicare Part A exhaustion), Standard Life paid the entire per diem rate of $900.

Post-exhaustion, Vencor billed Standard Life $122,929 for hospitalization costs for Mr. Weaks. However, Standard Life paid only $48,213 based on the $800 per diem rate set by Medicare. Post-exhaustion, Vencor billed Standard Life $381,093.99 for hospitalization costs for Mrs. Hollow, but Standard Life paid only $179,084 based on the $900 per diem rate set by Medicare. [*See* Affidavit of Standard Life Claims Manager Darlene Primm, J.A. pp. 128-130; Brief of Appellee, p. 11.][4]

On January 13, 1998, Vencor filed suit in the United States District Court for the Western District of Kentucky, alleging breach of contract, subrogation, and promissory estoppel. According to Vencor, Standard Life breached its insurance contracts with Mr. Weaks and Mrs. Hollow by failing to pay Vencor its standard rates for Weaks's and Hollow's inpatient hospitalization following the exhaustion of their Medicare benefits. Vencor claimed direct damage as a result of the alleged breach, and further claimed that its provision of services to Mr. Weaks and Mrs. Hollow entitled it to be

_____

[4] Although not material to our decision in this matter, we note that the parties' briefs and the evidence of record are not consistent with respect to the precise amounts billed by Vencor and paid by Standard Life. *Compare* Complaint ¶¶ 23, 26, 43, 46 [J.A. pp.15, 18] (billed by Vencor for Weaks $122,929, paid by Standard Life $48,213; billed by Vencor for Hollow $385,126.27 paid by Standard Life $183,000.27) *and* Brief of Appellant, p. 11 (billed by Vencor for Weaks $122,929, paid by Standard Life $48,213; billed by Vencor for Hollow $381,093.99, paid by Standard Life $179,084) *with* Primm Affidavit ¶¶ A5, B5 [J.A. pp. 129-130] *and* Brief of Appellee, pp. 5-7 (paid by Standard Life for Weaks $40,800 and for Hollow $153,000). Despite the disparities, it appears that all parties are in agreement that the amount billed by Vencor for Mr. Weaks's and Mrs. Hollow's hospitalizations was two to three times more than the amount paid by Standard Life. *See Vencor, Inc. v. Standard Life and Accident Ins. Co.,* 65 F. Supp. 2d 573, 575 (W.D. Ky. 1999) ("In these two instances, [Vencor's] regular rates are between two and three times higher than the Medicare allowed rates.")

subrogated to their claims of breach, as well. Vencor also claimed that it had relied to its detriment on Standard Life's promise to cover Mr. Weaks's and Mrs. Hollow's medical expenses.

On December 11, 1998, Vencor moved for partial summary judgment on its Count I breach of contract claim, and on January 25, 1999, Standard Life cross-moved for partial summary judgment on that claim. On September 13, 1999, the District Court granted Standard Life's partial motion for summary judgment. *See Vencor, Inc. v. Standard Life and Accident Ins. Co.*, 65 F. Supp. 2d 573 (W.D. Ky. 1999) ("*Standard Life*"). The District Court found that the Weaks and Hollow insurance policies unambiguously limited Standard Life's obligation to Vencor to the Medicare per diem rate following the exhaustion of Weaks's and Hollow's Medicare benefits.[5] Vencor subsequently moved to amend or alter the judgment, and the court denied that motion.[6]

Then, on July 17, 1999, Standard Life moved for summary judgment on Vencor's remaining promissory estoppel claim. On March 9, 2001, finding that Vencor did not have sufficient evidence to demonstrate that Standard Life had made an unambiguous promise to Vencor on which it had relied to its detriment, the District Court granted Standard Life's motion and dismissed Vencor's claims in their entirety. Vencor timely appealed the District Court's decisions.

---

[5] Although not treating it as a separate "count," in deciding the breach of contract claim, the District Court also discussed Plaintiff's Count II subrogation theory in its opinion on the cross-motions for summary judgment on the breach of contract claim. *See, Vencor, Inc. v. Standard Life, supra*, 65 F. Supp. 2d at 575. The court treated its decision on the breach of contract claim as disposing of both Counts I and II.

[6] Vencor subsequently moved the court for relief from judgment pursuant to Fed. R. Civ. P. 60, and the court denied that motion as well.

1166. As the *Blue Cross* court noted, "[T]he only reasonable reliance by the insureds may have been in thinking that BCBS would pay 100% *of what Medicare would have paid*." *Id*. (Emphasis added). The Eleventh Circuit affirmed this determination. 248 F.3d 1174.

Furthermore, as the *Blue Cross* court found, it is not reasonable to rely on a statement made in a document that contains language specifically stating that it is not controlling. As in the *Blue Cross* case, the Outline of Coverage here plainly provided that it is not controlling. Because the Outline of Coverage specifically warned against relying on its terms, it cannot be considered as an unambiguous promise on the part of Standard Life and it was not reasonable for Vencor to have relied on a document that itself states it is not controlling.

Lastly, even if the insureds did rely to their detriment on the Outline of Coverage, the only reasonable reliance they might have had was in believing that Standard Life would pay 100% of their Medicare eligible expenses. *See Blue Cross*, 86 F. Supp. 2d at 1165. As indicated, this is what Standard Life has already paid. Accordingly, we find no error in the District Court's grant of summary judgment in favor of Standard Life on Plaintiff's promissory estoppel claim.

## IV. *CONCLUSION*

For the foregoing reasons, the District Court's entry of summary judgment in favor of Defendant Standard Life in this action is **AFFIRMED**.

important that you READ YOUR POLICY
CAREFULLY.

[Outline of Coverage, J.A., p. 374.]

Furthermore, even if a promise has been made, it must also
be demonstrated that *Vencor* justifiably relied to its detriment
on the promise before there can be a valid claim of
promissory estoppel. *Amacher*, 826 S.W.2d 480. Vencor
relies on *Vencor Hospitals South, Inc. v. Blue Cross and Blue
Shield of Rhode of Island*, 169 F.3d 677, 680 (11th Cir. 1999),
as support for its argument that Standard Life reasonably
should have expected reliance on its promises made to Mr.
Weaks and Ms. Hollow. Vencor quotes from the part of the
opinion that suggests why the "materiality of a similar
promise to a Medigap insured made in an outline of coverage"
might be read into the insurance policy. [Appellant's Brief,
pg. 48.]

Vencor's reliance on this suggestion is misguided. First,
this quote from the *Blue Cross* case is not even taken from a
discussion involving a claim of promissory estoppel; it was
taken from the court's discussion on whether or not the
Outline of Coverage should be considered a part of the
contract. Additionally, it is worth noting that the court
ultimately did not decide the issue of whether or not the
Outline of Coverage was to be considered a part of the
insurance policy. 169 F. 3d at 681 (stating that "[t]his
determination, however, requires an analysis of legislative
intent that is best undertaken in the first instance by the
district court.") The case was remanded to the district court
for further proceedings. *Id*. at 682.

On remand, the district court not only found that the
Outline of Coverage was *not* properly considered a part of the
contract, it also granted Blue Cross's motion for summary
judgment as to the promissory estoppel claim, stating that the
Outline of Coverage "does not constitute a definite statement
sufficient to induce reasonable reliance." 86 F. Supp. 2d at

## III.  *ANALYSIS*

### A.  *STANDARD OF REVIEW*

This Court reviews a district court's order granting
summary judgment *de novo*. *Peters v. Lincoln Electric
Co.*, 285 F.3d 456, 464 (6th Cir. 2002); *Darrah v. City
of Oak Park*, 255 F.3d 301, 305 (6th Cir. 2001). This
Court affirms a grant of summary judgment if "there is
no genuine issue as to any material fact and the moving
party is entitled to a judgment as a matter of law." Fed.
R. Civ. P. 56(c). A dispute over a material fact cannot
be "genuine" unless a reasonable jury could return a
verdict for the nonmoving party. *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court also
reviews *de novo* a district court's interpretation of an
insurance contract. *See BP Chemicals, Inc. v. First State
Ins. Co.*, 226 F.3d 420, 424 (6th Cir. 2000).

### B.  *LEGAL  STANDARD  FOR  CONTRACT
INTERPRETATION UNDER TENNESSEE LAW*

A federal court sitting in diversity must, pursuant to the
doctrine enunciated in *Erie Railroad v. Tompkins*, 304 U.S.
64 (1938), apply the substantive law of the forum state,
including conflict of law rules. The general conflicts rule in
Tennessee governing contracts is that the law of the state in
which the contract was made governs unless the parties
express the intent that another state's law applies. *Boatland,
Inc. v. Brunswick Corp.*, 558 F.2d 818, 821 (6th Cir. 1977);
*Davidson Specialty Chemical Co. v. S&H Erectors, Inc.*, 621
F. Supp. 783, 785 (E.D. Tenn. 1985). Here, the contracts
were issued in Tennessee and the parties are in agreement that
Tennessee law governs this dispute.

The resolution of this case ultimately turns on the
interpretation of a term in the insurance policy. Under
Tennessee law, in reviewing a contract for ambiguities, the

court should consider the contract as a whole. *Williamson County Broadcasting Co. Inc. v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn. Ct. App. 1998); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994). The language of the contract should be understood in its plain and ordinary meaning. *See American Ins. Reciprocal v. Hutchinson*, 15 S.W.3d 811, 814 (Tenn. 2001). "[A] contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1985). A contract is not rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions. *International Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 n.5 (Tenn. Ct. App. 2001). Nor is a contract rendered ambiguous simply by virtue of language which happens to be technical or complex to the layman. *Blaylock and Brown Constr. v. AUI Ins. Co.*, 796 S.W.2d 146, 149 (Tenn. Ct. App. 1990).

Interpretation of an unambiguous contract is a question of law for the court to decide. *Hamblen County v. City of Morristown*, 656 S.W.2d 331 (Tenn. 1983). "Where a contract is clear and unambiguous, parties' intentions are to be determined from the four corners of the contract." *Pierce v. Flynn*, 656 S.W.2d 42 (Tenn. Ct. App. 1983); *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986). However, even when the agreement is unambiguous, the court may "consider the situation of the parties and the accompanying circumstances at the time it was entered into -- not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining" the contract's meaning. *Hamblen, supra*, 656 S.W.2d at 334 (quoting Restatement of Contracts § 235(d) and Comment).

The Court will apply the foregoing standards in deciding Vencor's appeal of the District Court's determination with respect to the insurance contracts at issue in this case.

opposed to the Medicare per diem rate." [J.A. p. 24.] We, too, find insufficient evidence to support a claim of promissory estoppel.

In order to establish a claim of promissory estoppel, a plaintiff must show that a promise was made and that the plaintiff reasonably relied on the promise to his detriment. *Calabro v. Calabro*, 5 S.W. 3d 873, 879 (Tenn. Ct. App. 2000). Further, "the promise upon which the promisee relied must be unambiguous and not unenforceably vague." *Id.; see also Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480 (Tenn. Ct. App. 1991).

The first element necessary to prove a claim of promissory estoppel is a promise. *Amacher*, 826 S.W.2d 480. This element is not satisfied in the current case. Vencor contends that the Standard Life promised to pay 100% of all Medicare eligible expenses for 365 days after Part A benefits had expired, leaving the insureds responsible only for non-covered charges.

The Medigap policy itself contains the first part of the promise that Vencor alleges was made, i.e., the promise to provide coverage for Medicare eligible expenses for 365 days after exhaustion of Medicare Part A benefits. Vencor contends that the document that allegedly promises to cover all but "non-covered charges" is the Outline of Coverage. However, the Outline of Coverage cannot be construed as a "promise" where it unequivocally cautions that only the actual policy provisions will control. The Outline contains the following language:

Read Your Policy Carefully. This outline of coverage provides a very brief description of the important features of your policy. This is not the insurance contract and only the actual policy provisions will control. The policy itself sets forth in detail the rights and obligations of both you and your insurance company. It is, therefore,

"recognized as reasonable" is used to refer to the reasonableness of costs. *See* 42 C.F.R. § 413.30.

The foregoing establishes that the District Court did not err in determining that the provisions of Standard Life insurance policies at issue are not ambiguous and that the insurer here is required to pay the hospital only for health care expenses of the insureds using the Medicare per diem rate allowed. Since Standard Life has already paid Vencor that amount, there has been no breach of the insurance contract. Therefore, the District Court properly granted summary judgment in favor of Standard Life on Counts I and II of Vencor's Complaint.

## D.  *PROMISSORY ESTOPPEL*

Vencor also argues that Standard Life should be promissorily estopped from denying inpatient hospitalization coverage for Mr. Weaks and Mrs. Hollow over the Medicare per diem amount based on statements made to the insureds, not to Vencor. Vencor contends that it is entitled to bring this claim as an assignee of the insureds.[11] Noting that "only a promise by Standard Life to Vencor would be important," the District Court entered summary judgment in favor of Standard Life on this claim finding that "Vencor has produced no evidence that Standard Life made a promise or representation that the policy would pay Vencor's standard or full rates, as

---

[11]Standard Life argues that Vencor has waived this argument because this is a new claim that was not in the initial Complaint. (In Vencor's Complaint the promissory estoppel claim was based upon statements allegedly made by Standard Life to Vencor. *See* Complaint, J.A. p. 11, ¶¶ 58-60.) Although not addressed in the initial Complaint, this issue was raised in Vencor's Opposition to Defendant's Motion for Summary Judgment. [J.A., pp. 647, 659]. In its Opposition to Defendant's Motion for Summary Judgment, Vencor asserted that Standard Life "promised its insureds, Mrs. Hollow and Ms. Weaks, and, consequently, Vencor, that it would provide 100% coverage for 'Medicare eligible expenses.'" *Id.* Therefore, this third-party/assignee promise issue *was* raised in the District Court and, accordingly, Vencor's right to appeal this claim has not been waived.

## C.  *"MEDICARE ELIGIBLE EXPENSES"*

The central issue in this case is whether the Medigap insurance policies issued by Standard Life to Mr. Weaks and Mrs. Hollow unambiguously provide coverage only at the rate provided by Medicare after Medicare Part A coverage expired. This issue turns on the meaning of the phrase "Medicare eligible expenses."

As indicated, both the Weaks and Hollow policies contain the following definition of "Medicare eligible expenses":

> **'Medicare Eligible Expense'** means health care expense of the kind covered by Medicare to the extent recognized as reasonable by Medicare.

[J.A. 132, 136.]

The District Court found that, when the contract is considered as a whole, this definition is unambiguous and should be read as containing two separate parts. As explained by the District Court:

> [T]he first prong of the definition "of the kind covered by Medicare" must refer to *expenses for the type or quantity of care medically necessary* under the circumstances. The second prong of the definition, "to the extent recognized as reasonable by Medicare" must refer to *charges that are reasonable for the medically necessary care.*

*See Standard Life*, 65 F. Supp. 2d at 577 (emphasis added).

At the heart of Vencor's appeal is the District Court's determination that the phrase "to the extent recognized as reasonable by Medicare" refers to the reasonableness of costs. Standard Life agrees with the District Court's determination and maintains that the phrase "Medicare eligible expenses" clearly and unambiguously refers to the cost of services or more specifically, to the per diem amount set by Medicare. It

is undisputed that Standard Life has already paid Vencor this amount. Accordingly, if this is the clear and unambiguous definition, then Standard Life is not in breach of its contract with Vencor.

Conversely, Vencor believes that the definition of Medicare eligible expenses is ambiguous and should be construed to encompass all care provided that is reasonable and necessary. In other words, Vencor believes that the insurance policies issued by Standard Life to Mr. Weaks and Mrs. Hollow do not limit Standard Life's post-exhaustion liability to the rates set by Medicare. Vencor claims that the phrase "to the extent recognized as reasonable by Medicare" relates only to the reasonableness of services, not the dollar amount charged for those services. Therefore, Vencor maintains that it is not limited to charging only the per diem amount allowed by Medicare post-exhaustion. Relying on this definition, Vencor seeks to recover the balance between its regular rates and the per diem amount set by Medicare (which Standard Life has already paid to Vencor) from Standard Life.

The District Court noted that, viewed in isolation, Vencor's construction of "Medicare eligible expenses" might have some appeal. However, when the contract is considered as a whole, Vencor's interpretation becomes implausible.

As the District Court observed, Both the Weaks and the Hollow policies use the term "Medicare eligible expenses" in the "Part A Benefit" provisions of the "Benefits" section of the contract to refer to the amount of money Standard Life will pay. The first paragraph of the Part A Benefit section provides:

> Standard Life will pay a benefit to supplement Part A of Medicare when you incur expenses as a result of injury or sickness. The benefit for each benefit period will be equal to the **Medicare eligible expense** you incur for a) the Part A inpatient hospital deductible if the application shows Plan 1 or Plan 2 was selected [and]

---

As noted, once it has determined that the policy language is unambiguous the court is not bound to look outside the four corners of the document to determine its meaning. *Pierce v. Flynn*, 656 S.W.2d 42, 45 (Tenn. Ct. App. 1983); *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986). As a result, the Court is not obligated to look to other documents to determine the meaning of "Medicare eligible expenses." However, as the District Court observed, added support for finding that "Medicare eligible expense" refers to the cost, as opposed to the type, of services provided is found in the structure of Medicare statutory and regulatory provisions that govern both Medicare and Medigap insurers. In terms of the structure of reimbursement, Medicare determines the reasonable cost and quantity of care that will be covered; an expense will not be covered unless it is both medically necessary and reasonable. *See* 42 U.S.C. §1935y. The District Court also correctly pointed out that the only section of Medicare regulations where the phrase "recognized as reasonable" is used is the section governing the Reasonable Cost Reimbursement System ("RCRS"), and in that section,

---

Medicare.

The dissent similarly misconstrues the policy's provision regarding "Additional Nursing Facility Benefits." Medicare pays for care in a skilled nursing facility for 100 days during any spell of illness. *See* 42 U.S.C. § 1395d(a)(2), 1395x(h). Pursuant to the policies at issue here, beginning with the 21st day of nursing facility confinement, Standard Life will pay for up to 80 days per confinement when either the facility or the confinement is not approved by Medicare or, in the case of a Medicare approved confinement, when the insured's Medicare 100-day limit is exhausted. [J.A. 132, 136.] However, in either instance, the maximum amount Standard Life will pay is "an amount equal to the daily benefit that would have been paid under the policy for the 21st through 100th day of a Medicare approved stay." *Id.* With respect to coverage for nursing facility care, the policy provides that "Standard Life will pay a benefit to supplement Part A of Medicare. . . equal to the Medicare eligible expense you incur for. . . skilled nursing facility coinsurance amounts." *Id.* Thus, contrary to the dissent's assertion, the "Additional Nursing Facility Benefits" clause does not support a finding of ambiguity with respect to the term "Medicare eligible expense."

The foregoing discussion of cases addressing the same or substantially similar definitions of "Medicare eligible expense" makes clear to us that the District Court did not err in finding that there is no ambiguity in the Weaks and Hollow Standard Life policies with respect to the definition of "Medicare eligible expenses" or the phrase within that definition "to the extent recognized as reasonable by Medicare." The plain language of the definition and reading the policies as a whole establish that the definition refers to the cost, not the type, of services provided.[10]

---

[10] The dissent would hold that the term "Medicare eligible expense" is ambiguous and maintains that the ambiguity of the term is not resolved in the context of the policies as a whole. As support, she points to the Part B Benefit provision in the policy, which states in pertinent part:

> PART B BENEFIT.   Standard Life will pay a benefit to supplement Part B of Medicare. . . .   The benefit will be equal to the difference between the Medicare eligible expense you incur and what Medicare pays. . . .   If you are not covered under Part B of Medicare, Standard Life will determine Medicare eligible expense and what Medicare would have paid as if you were covered under Part B of Medicare.

[J.A. 132, 136.]

The dissent's position is that the above provision demonstrates that at least one clause in the Standard Life policies distinguishes between "Medicare eligible expense" and the amount Medicare actually pays, such that our construction of "Medicare eligible expense" as meaning costs recognized as reasonable by Medicare is not supported by reading the policy as a whole. The dissent's view, however, neglects to take into consideration what Medicare pays under Part B. For medical and health services, Part B Medicare pays only "80 percent of *the reasonable cost of the services*." *See* 42 U.S.C. § 1395*l*(a)(1) (emphasis added); *see also* 42 C.F.R. § 410.152(b)(1) (basic rules for payment of covered Part B services). Thus, pursuant to the policy provision relied upon by the dissent, Standard Life would pay the 20 percent of the "reasonable cost of the services" (i.e., the Medicare eligible expense) which Medicare does not pay. Therefore, the policy's distinction in the Part B provision between a "Medicare eligible expense" and the amount Medicare pays does not demonstrate any internal inconsistency when "Medicare eligible expense" is construed as referring to costs recognized as reasonable by

b) the Part A hospital coinsurance amounts beginning with your 61st day of hospital confinement. . . .

It is clear that in this section "Medicare eligible expense" could mean nothing other than the per diem amount. As indicated above, Medicare Part A provides that Medicare pays to provider hospitals the per diem amount less a deductible and less a co-insurance payment. *See* 42 U.S.C. §§ 1395e(a)(1), 1395f(b)(1).[7] The deductible or co-insurance is deducted from the per diem amount, *not* from the Vencor's "standard" charge. The references to "Medicare eligible expense," thus, would make little sense if construed as anything other than the Medicare-allowed amount.

---

[7] 42 U.S.C. § 1395e(a)(1) provides, in pertinent part:

(1) The amount payable for inpatient hospital services or inpatient critical access services furnished an individual during any spell of illness shall be reduced by a deduction equal to the inpatient hospital deductible. . . .   Such amount shall be further reduced by a coinsurance amount equal to --

> (A) one-fourth of the inpatient hospital deductible for each day (before the 91st day) on which such individual is furnished such services during such spell of illness after such services have been furnished to him for 60 days during such spell; and

> (B) one-half of the inpatient deductible for each day. . . on which such individual is furnished such services during such spell of illness after such services have been furnished to him for 90 days during such spell. . . .

42 U.S.C. § 1395f(b) provides, in pertinent part:

The amount paid to any provider of services. . . shall. . . be --

(1). . . the lesser of (A) the reasonable cost of such services as determined under section 1395x(v) [i.e., the Medicare per diem rate], or (B) the customary charges with respect to such services. . . .

In the second paragraph of the "Part A Benefit" section of the policy, the term "Medicare eligible expense" again appears:

> If you are confined in a hospital for at least 90 days in a benefit period and have used all your lifetime reserve days, Standard Life will pay a benefit for each day of the continued confinement, subject to a lifetime maximum of 365 days. The daily benefit will be equal to 100% of the **Medicare eligible expense** you incur.

This paragraph describes Standard Life's obligations afer Medicare benefits are exhausted. This is the paragraph at issue in Plaintiff's breach of contract claim. As the District Court observed, the term "Medical eligible expense" in this paragraph must also limit the amount Standard Life will pay. Otherwise the meaning of "Medicare eligible expense" would vary from paragraph to paragraph within the policy. In order to keep the definition of "Medicare eligible expenses" consistent throughout the insurance policy, in this section the phrase must not refer solely to the type of expense covered by Medicare, as Vencor contends, but must also limit Standard Life's payment obligation as it does in the previous paragraph. Furthermore, as Standard Life points out, there is no logical explanation as to why the "Medicare eligible expense" could be the per diem amount during the first 150 days (i.e., while it is subject to the deductions for the hospital deductible and co-insurance amounts as provided in the first paragraph of the Part A Benefit section of the policy) and an amount two to three times the per diem rate commencing on day 151, when coverage is triggered under the second paragraph of the Part A Benefit section.

The District Court's determination that the phrase "Medicare eligible expenses" is not ambiguous is consistent with the decisions of virtually every other court which has faced this precise issue. In both published and unpublished opinions, courts in the Fifth, Ninth and Eleventh Circuits have uniformly ruled that a Medigap insurer's liability

We therefore conclude that, reading only the language of the NSIC insurance policy, the coverage provisions obligated NSIC to reimburse Vencor only at the rate Medicare would have paid.

*Id*. at 1031-32 (footnotes omitted); *see also, Vencor Hospitals, California, Inc. v. Millar*, No. G023140 (Cal. Ct. App., June 28, 2001) (unpublished decision) (holding that the phrase "to the extent recognized as reasonable by Medicare" in a Medigap policy containing a definition of "Medicare eligible expenses" substantially similar to the definition in the present case was not ambiguous and referred to the cost of the service, not the type of service.)[9]

---

[9]Vencor's reliance on *Vencor, Inc. v. Physician's Mutual Ins. Co.*, 211 F.3d 1323 (D.C. Cir. 2000) ("*Physician's Mutual*"), is misplaced. The cross-motions for summary judgment in that case involved only *a patient's liability* to the hospital after exhaustion of Medicare coverage, *not* an insurer's liability which is the issue in the present case. *Physician's Mutual*, 211 F.3d at 1324-25. The issue of whether the hospital may collect more than the Medicare-allowed rate from its patients is not before us in this action.

The Court also rejects Vencor's argument for application of *Vencor v. National States Ins. Co.*, No. 94-894-CIV-T-21E, 1995 U.S. Dist. LEXIS 21544 (M.D. Fla., June 22, 1995), *aff'd*, 120 F.3d 274 (11th Cir. 1997), because the policy language which the court in that case found ambiguous is not at all similar to the "to the extent recognized as reasonable by Medicare" language present in this case.

Nor is the Court persuaded by Vencor's reliance on the "Outline of Coverage" provided to Mr. Weaks and Mrs. Hollow, which provided that the insureds would be liable only "for non-covered charges," and the Medicare "Explanation of Benefits" ("EOB") forms which stated that the insureds' non-covered charges were "zero." Neither the Medicare EOB nor the Outline of Coverage is part of the insurance contract. *See Vencor, Hosp. South, Inc. v. Blue Cross and Blue Shield of Rhode Island, supra,* 86 F. Supp. 2d at 1160; *Vencor, Inc. v. Nat. States Ins. Co., supra*, 303 F.3d 1034. The Medicare EOB is a document in which Medicare details the benefits being provided to patients. This is not a document created by Standard Life and does not reflect any undertaking by Standard Life. As for the Outline of Benefits, the Outline itself clearly states that it is not the insurance contract and that only the actual policy provisions control. [Outline of Coverage, J.A. 374.]

The Ninth Circuit found that "[r]eading all three of these coverage provisions together, as we must, demonstrates that the 'to the extent. . . covered" language in the contract refers to the dollar amount that Medicare pays for the same services." *Id.*   The court reasoned as follows:

> Hospitalization coverage provisions (a) and (b) use the term "Part A Medicare-eligible expense." In each case, the provision then goes on to say that coverage is "to the extent not covered by Medicare," plainly referring to an amount of money for the eligible service that Medicare will not pay and that the insurance policy will pay instead. Just as "to the extent not covered by Medicare" in (a) and (b) refers to cost--amounts not reimbursed by Medicare, so too must "to the extent as would have been covered by Medicare" refer to the dollar amount Medicare would pay if coverage had not been exhausted.

> This conclusion is further supported by breaking coverage grant (c) into two parts: (1) "Medicare Part A eligible expenses for hospital confinement;" and (2) "to the same extent as would have been covered by Medicare." Vencor maintains that the second part of the provision means the "sort" of services covered by Medicare.  But the policy, as required by law, defines "Medicare-eligible expense" to mean "expense of the kind covered by Medicare, to the extent recognized as reasonable and medically necessary by Medicare." This phrase directly refers to the sort of expenses that Medicare would cover.  Thus, if Vencor's argument regarding the second phrase is correct, then each part of the provision means the same thing:  The policy would cover the sort of services Medicare covers to the extent that they are the sort of services that Medicare covers. On the other hand, if the second part of the provision refers, as NSIC contends, to the Medicare rate, then the coverage grant makes sense:  it covers the sort of services covered by Medicare up to the amount that Medicare would have paid for them.

post-exhaustion is limited to the Medicare rate or a percentage of the Medicare rate, whichever is specified in the contract.

For example, in *Vencor Hosp. South, Inc. v. Blue Cross and Blue Shield of Rhode Island*, 86 F. Supp. 2d 1155 (S.D. Fla. 2000), *aff'd*, 284 F.3d 1174 (11th Cir. 2002) ("*Blue Cross*"), Vencor sued the insurer, Blue Cross Blue Shield ("BCBS") to recover the insured's benefits as a third party beneficiary. The Medigap policy at issue there provided that BCBS would pay 90% "of all Medicare Part A Eligible Expenses for hospitalization not covered by Medicare subject to a lifetime maximum benefit of an additional 365 days" after Medicare coverage had been exhausted.   *Id*. at 1157.   The term "Medicare eligible expenses" was defined in the policy as "the health care expenses covered under Medicare which Medicare has determined are reasonable and medically necessary." *Id*.  As it does in the current case, in *Blue Cross*, Vencor argued that the phrase referred to types of services provided, not to the expenses.   The district court rejected Vencor's argument and concluded that

> "Medicare Eligible Expenses" can only refer to costs that would be eligible for payment under Medicare.  Such a conclusion is mandated by the policy's very own definition of the term.

*Id*. at 1162.

In reaching this conclusion, the court looked to the ordinary meaning of the word "expenses" and noted that "[e]very definition of 'expense' whether in a new dictionary or old, or even on-line, makes clear that the word 'expense' refers to a cost or outlay." *Id*. at 1161.

Similarly, in *Vencor Hospitals, Inc. v. Standard Life and Accident Ins. Co.*, No. 97-1976-CIV-T-26E (M.D. Fla., Sept. 22, 1998) (unpublished decision), *aff'd*, 279 F.3d 1306 (11th Cir. 2002) ("*Standard Life Florida*"), Vencor sued Standard Life on the same grounds as it has in the current case, namely, breach of contract, subrogation, and promissory

estoppel.  The Medigap policy in *Standard Life Florida* provided for post-exhaustion coverage of "90% of the Medicare eligible expense" incurred by the patients.  The definition of "Medicare eligible expense" was identical to the definition presently before this Court.  The *Standard Life Florida* court found that this term was unambiguous, reasoning:

> The phrase "Medicare eligible expenses" clearly refers to the actual amount allowable under Medicare.  This plain meaning is supported by the use of the word Medicare in conjunction with the words "expense" and "eligible."[8] The plain meaning of the policy provision is further supported by the fact that the insured's benefit under this policy is described as "equal to 90%" of the "Medicare eligible expense," and the language preceding the above-quoted provision: "Your PART A BENEFIT under your policy will be equal to the Medicare eligible expense you incur for 1) the Part A inpatient hospital deductible; 2) the Part A hospital coinsurance amounts beginning with your 61st day of hospital confinement; the Part A blood deductible; and 4) the skilled nursing care facility coinsurance amounts."  When read in its entirety, this paragraph clearly uses the phrase "Medicare eligible expense" as the quantifiable expense allowed by Medicare.

*Standard Life Florida* 9/22/98 Op. at pp. 5-6. [Brief of Appellee, Ex. 1.]

In *Vencor Hospitals Texas, Ltd. v. Standard Life and Accident Ins. Co.*, No. A-97-CA-606JN (W.D. Tex., Oct. 7, 1999) (unpublished decision), *aff'd*, 205 F.3d 1337 (5th Cir. 1999) ("*Standard Life Texas*") the court was confronted with

---

[8]The court noted that "expense" is defined in the dictionary as "that which is expended, laid out, or consumed; an outlay; charge; cost [or ] price," and "eligible" is defined as "fitted or qualified to be chosen or used."  9/22/98 Op. at n. 1.

the issue of whether a Medigap insurance policy unambiguously provided coverage only at the Medicare per diem rate.  As in the instant case, in *Standard Life Texas*, the benefit provided after exhaustion of Medicare Part A coverage was to be "equal to 100% of the Medicare eligible expenses" incurred by the patient.  The definition of "Medicare eligible expense" in the Texas case was identical to the definition now before this Court.  The *Standard Life Texas* court found the policy language unambiguous, stating that "when read in its entirety, the Policy clearly uses the phrase 'Medicare eligible expenses' as the quantifiable expense allowed by Medicare." *Standard Life Texas*, 10/7/98 Op. pp. 3-4. [Brief of Appellee, Ex. 2.]  The court accordingly found that the Defendant was entitled to summary judgment on the breach of contract claim.

The Ninth Circuit recently reached the same conclusion in *Vencor, Inc. v. National States Insurance Company*, 303 F.3d 1024 (9th Cir. 2002). The policy at issue in that case provided as follows:

> HOSPITAL BENEFIT -- We will provide:
> (a) Coverage of Part A Medicare-eligible expense for hospital confinement to the extent not covered by Medicare, from the 61st day through the 90th day in any Medicare benefit period.
> (b) Coverage of Part A Medicare-eligible expense for hospital confinement to the extent not covered by Medicare for each Medicare lifetime inpatient reserve day used.
> (c) Upon exhaustion of the Medicare hospital inpatient coverage including the lifetime reserve days, coverage of the Medicare Part A eligible expenses for hospital confinement to the same extent as would have been covered by Medicare, subject to a lifetime maximum benefit of an additional 365 days.

*Id.* at 1031.