NEW JERSEY SUBURBAN WATER COMPANY, A BODY COR-
PORATE, PLAINTIFF-RESPONDENT, v. TOWN OF HAR-
RISON, A MUNICIPAL CORPORATION, DEFENDANT-
APPELLANT.

Argued October 21, 1938—Decided January 13, 1939.

For the appellant, *Michael J. Bruder* (*Anthony P. Kearns,* of counsel).

For the respondent, *George W. C. McCarter.*

For the Board of Public Utility Commissioners (by permission of the court), *Frank H. Sommer* and *John A. Bernhard.*

The opinion of the court was delivered by

HEHER, J. In our view, there is serious question as to whether the respondent utility designed the "petition" filed by it with the Board of Public Utility Commissioners on April 29th, 1936, as a schedule of increased rates fixed by the utility under the authority conferred by section 17 (h) of chapter 195 of the laws of 1911, as amended by chapter

150 of the laws of 1926 (*Pamph. L.* 1911, *pp.* 374, 380; *Pamph. L.* 1926, *pp.* 239, 240; *R. S.* 1937, 48:2-21d), and therefore effective, by the mere act of filing, until suspended, changed, or altered by the board pending the determination of the ultimate question of whether the rates so promulgated were "just and reasonable."

The presentation of the companion petition for a specified surcharge, based upon its alleged "failure to earn a fair return upon the capital invested in the property devoted to the public use," considered in the light of the dismissal by the board of a prior application by the utility for an increase of rates, "without prejudice" to the filing of petitions for an increase of rates and a surcharge, would seem to indicate a purpose to invoke the procedure outlined in section 16 (c) of the cited statute, as amended by chapter 50 of the laws of 1935 (*Pamph. L.* 1911, *pp.* 374, 377; *Pamph. L.* 1935, *p.* 129; *R. S.* 1937, 48:2-21b (1)), authorizing the board "to fix just and reasonable individual rates, joint rates, tolls, charges or schedules thereof," and so forth, "after hearing, upon notice." In the prior proceeding, there were two orders suspending the operation of the rate increase *pendente lite.* The second (the statute permitted but two, each for a period not exceeding three months) expired of its own limitation on October 15th, 1930. On September 24th, 1930, it was stipulated by the attorney for the utility that, "in the event that the present order of suspension expires and the hearings on the application of the company for increased rates have not been concluded, the New Jersey Suburban Water Company will continue to bill the municipalities at the same rate as at present, until such times as the rates are fixed by the Board." Due to the non-action of the utility, the matter was not again brought on for hearing until October 2d, 1935; and the proceeding was not concluded until 1936, with the result hereinbefore stated.

But, however this may be, the utility subsequently pursued a course of action that, if not to be deemed a clarification of the original purpose, certainly constituted an election to proceed under section 16 (c) of the statute, *supra;* and it is thus precluded by its own conduct from the enforcement of the

rate increase embodied in the petition as regards water delivered during the pendency of the proceedings before the Utility Commission. The proceedings terminated in an order by the commission, entered on October 4th, 1937, adjudging the existing rate to be just and reasonable, and disapproving the proposed increase; and the utility now seeks to enforce, for water sold to the municipality in the *interim,* a rate thus deemed by the Utility Commission to be unjust and unreasonable. We entertain the view that, for reasons to be presently stated, the doctrine of estoppel *in pais* is operative against the utility.

On June 30th, 1936, the respondent utility dispatched this communication to the Utility Board:

"We beg to acknowledge receipt of your letter of the 24th instant, advising that every public utility will hereafter be required by the board to give not less than sixty (60) days' written notice, in advance, of any change or variation in the rate of depreciation.

"This Company, as you know, has filed with the Board, under date of April 29th, last, a new schedule of rates, effective June 1st, 1936, as to the rate, and presumably until after action by the Board as to the surcharge.

"By mutual consent we will continue to bill the towns at the old $99.00 rate until the new rate shall have been fixed by the Board. Likewise, we will make no entries on the books as to depreciation or amortization until action has been taken by the Board, in view of the imminence of the anticipated action by your Honorable body directing what amount shall be proper."

The utility continued to bill the municipality (its sole customer), and to receive payment, for water delivered, at the old rate. The bills thereafter submitted for the year 1936 contained this notation:

"Pending the determination of the rate to be fixed by the Board of Public Utility Commissioners under the application of this Company, dated April 29th, 1936, for an increase in rate, this bill is by mutual consent rendered at the old rate of $99.00 per million gallons, and is subject to correction after action thereon shall have been taken by the Board."

For the quarter ending March 31st, 1937, payment was demanded at the increased rate. The reason assigned therefor by the utility was that its board of directors, on the advice of counsel, "took the ground that the rate had been made affirmative by negative action on the part of the Board of Public Utility Commissioners because their six month power of suspension had expired."

And, when the petitions in question came on for hearing before the Utility Commission, it was plainly understood between the parties that the increase of rate should not become operative during the pendency of the proceedings, except as ultimately approved by the Utility Commission, and that, meanwhile, water delivered to the appellant municipality was to be billed at the old rate. Again, at a later hearing held on February 16th, 1937, counsel for the utility reiterated the common understanding that the old rate was to continue in effect until the board determined the rate. In response to Commissioner Reardon's question as to the effect of the stipulation made in the prior proceeding for the maintenance of the old rate *pendente lite,* he acknowledged that it was effective for "what it purports to do, that until this court makes an order we cannot charge a cent more than $99." He continued: "Yes, we cannot bill them for the month of February [1937] at more than $99. We don't claim that we can. We claim that when the board decides this case the board will fix a rate—we don't care and still don't care whether it is all in the rate or divided between the rate and the surcharge— but the board said the proper procedure is to segregate it in order that certain of the items will cease after a definite period of years and will not go on until—— * * *. Now, then, as I say, if the board feels that the proper procedure requires segregation and separation of some of the money, the price to be paid by the Town of Harrison, into a rate and a surcharge, that is all right with us, because it is dollars and cents just the same, but we realize neither the rate nor the surcharge—if there is to be a rate and a surcharge—shall commence one day before the board makes its order, which may be March 1st or April 1st, whenever you make your order. Then the new deal begins, and meanwhile, no matter how

long these delays have been—and they have been very long, since I was first here arguing with your Honor—we are stuck with the $99 rate. That is the situation. * * * I think we are stuck with it [the old rate of $99] in full until the board makes its order. Then this stipulation spends its force, and from and after the date of this board's order, this stipulation is of no effect."

We are of opinion that, by force of these circumstances, the Water Company is estopped from asserting that the document in question constituted a rate schedule automatically effective under section 17 (h) of the cited statute, and therefore enforceable as respects water supplied in the *interim,* notwithstanding the subsequent finding of the Utility Commission that the rate was unjust and unreasonable.

In modern usage, equitable estoppel and estoppel *in pais* are convertible terms, embracing also *quasi*-estoppel. They embody the doctrine, grounded in equity and justice, that one shall not be permitted to repudiate an act done or position assumed where that course would work injustice to another who, having the right to do so, has relied thereon. An estoppel arises "where a man is concluded and forbidden by law to speak against his own act or deed; yea, even though it is to say the truth." *Termes de la Ley, tit. "Estoppel,"* cited in *Demarest* v. *Hopper,* 22 *N. J. L.* 599, 619. It is operative where a person "has done some act which the policy of the law will not permit him to gainsay or deny." 1 *Greenl. Evid.* (16th ed.) *ch. VI,* § 22. See, also, *Blk. Com.* 308. While the creature of equity, and governed by equitable principles, it is a doctrine enforceable in courts of common law jurisdiction. *LaRosa* v. *Nichols,* 92 *N. J. L.* 375; *Central Railroad Co.* v. *MacCartney,* 68 *Id.* 165. It is of the essence of equitable estoppel that one is precluded from taking a position inconsistent with that previously assumed and intended to influence the conduct of another, if such repudiation "would not be responsive to the demands of justice and good conscience," in that it would effect an unjust result as regards the latter. *Rothschild* v. *Title Guarantee and Trust Co.,* 204 *N. Y.* 458; 97 *N. E. Rep.* 879; 41 *L. R. A. (N. S.)* 740.

But it is argued on behalf of the utility that there is no proof of reliance upon its written consent "to bill * * * at the old rate until the new rate" should have been "fixed by the board," or upon what counsel said at the hearings, termed "an informal exchange of views *arguendo*," and signifying, "at the worst," that counsel "was laboring under a mistaken view of the law, and of the legal effect of the old stipulation."

We find this claim to be untenable. The municipality challenged the fairness of the increased rate at every stage of the proceedings. The Utility Commission twice exercised its suspensive power during the first proceeding; and, as pointed out, the utility stipulated to continue the existing rate, after the second order of suspension had expired of its own limitation, "until such time as the rates" should be "fixed by the board." The subsequent expression—in the second proceeding—both by written communication and by counsel's stipulation, of the utility's "consent to bill at the old rate until the new rate" should have been "fixed by the board," was plainly designed to obviate the need of action looking to a suspension of the increased rate; and that the position thus taken was relied upon by the municipality is indisputable under all the circumstances. It found—and justifiably so—no need to apply for a suspension of the operation of the petition as a rate schedule. In point of fact, the utility's letter of June 30th, and the endorsements upon the bills submitted for water furnished in the latter half of the year 1936, stated that the obligation to maintain the *status quo* was derived from "mutual consent;" and the utility will not now be heard to assert the contrary.

And the Utility Commission was likewise led to believe that there was no occasion to exercise, *ex mero motu,* the power of suspension *pendente lite* of such rate increases; and that in itself sufficed to create an estoppel. It had a statutory duty to perform in the premises; and public policy will not tolerate the repudiation of a stipulation thus given to stay the hand of the board in the exercise of its statutory function, especially where, as here, the result will be the enforcement of a right *pendente lite* that was ultimately found to be unjust and unreasonable.

To work an estoppel, it is not requisite that a fraudulent intent be shown. Actual fraud is not an essential ingredient. If the conduct works an unjust or inequitable result to the person it was designed to influence, the doctrine is applicable. *Rothschild* v. *Title Guarantee and Trust Co., supra.*

The point is also made that the utility "received no consideration" for the stipulation adverted to, and the doctrine of estoppel is therefore not invocable. But equitable estoppel is not grounded in the principles of contract. It is designed to prevent fraud and injustice, and needs no consideration for its operation. "It is not necessary that an equitable estoppel rest upon a consideration or agreement or legal obligation." *Rothschild* v. *Title Guarantee and Trust Co., supra.*

Moreover, the evidence conclusively shows a waiver by the utility of such right as it might have, under section 17 (h) of the cited statute, to immediate enforcement of the rate increase, in the absence of a formal order of suspension. *McCue* v. *Silcox,* 122 *N. J. L.* 12; *Smith* v. *National Commercial Title, &c., Co.,* 120 *Id.* 75; 21 *C. J.* 1115.

And there is no merit in the contention that, at all events, the Utility Commission could not lawfully suspend the increased rates for a longer total period than six months, and therefore there is no estoppel against the enforcement of the claim in suit. If the stipulation adverted to had not been made, and the board had exercised its power of suspension, the statutory limitation would furnish, as it was manifestly intended to, a cogent reason for action by the board within the six months' period. In such circumstances, the utility is precluded from so limiting the stipulation.

The judgment is accordingly reversed.

*For affirmance*—None.

*For reversal*—The Chancellor, Trenchard, Parker, Bodine, Heher, Perskie, Hetfield, Wells, WolfsKeil, Rafferty, JJ. 10.