845 A.2d 615 (2003)
368 N.J. Super. 66
BURDETTE TOMLIN MEMORIAL HOSPITAL, Plaintiff-Respondent,
v.
ESTATE OF Mary R. MALONE, Estate of Thomas Malone, and John Malone, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Submitted May 21, 2003.
Decided June 10, 2003.
*616 Chance & McCann, Bridgeton, for appellants (Tyler James Larsen, on the brief).
Gary Dinenberg, Northfield, for respondent.
Before Judges KING and WECKER.
KING, P.J.A.D.
This is an appeal from an order granting summary judgment in favor of plaintiff Burdette Tomlin Memorial Hospital (the Hospital) on a bill for unpaid medical expenses in the amount of $18,472.76. Medicare had originally been billed for these services in the amount of $5,659.72. Medicare refused to pay the Hospital's bill because defendant's Medicare life-time-care coverage had expired. See Vencor, Inc. v. Standard Life and Accident Ins. Co., 317 F.3d 629 (6th Cir.2003) (explaining limits of Medicare Part A coverage, 42 U.S.C.A. § 1395; 42 C.F.R. § 413). The Hospital then sought payment of more than triple the Medicare rate from the decedent-patient's estate. The Law Division judge granted the Hospital's motion for summary judgment in the amount of $18,472.76. We conclude that the judge erred and that the Hospital was only entitled to recover the Medicare rate from the estate, the sum of $5,659.72, in these particular circumstances.
The decedent, Mrs. Malone, was admitted as a Medicare patient "on numerous occasions prior to her receiving treatment that relates to this final bill." As noted, Medicare refused to pay the bill after Mrs. Malone died. The bill then was revised and she was sent a new statement for $18,472.76 "almost a year after her death."
Lynn Riley, the Hospital's credit supervisor, testified in discovery that if the $5,659.72 amount had been paid by Medicare, the bill would have been satisfied in full. William Zauner, Vice President of Finance, certified that the $18,472.76 charges finally billed to Mrs. Malone and the estate were "the usual and customary charges for the services involved" and "were fair and reasonable." The Hospital rejected the estate's offer to pay the Medicare bill as "full and final settlement" of the claim.
At argument on rehearing, counsel for the estate urged his position this way:
MR. MCCANN: I'm not sure if it was clear from the original argument presented that this lady was accepted on this particular occasion into the hospital as a Medicare/Medicaid patient. She's been in the hospital a number of times. That was the condition on which she was accepted into the hospital. They accepted her under the current [sic] conditions and expected to render a bill for whatever their usual and customary charges were.

*617 After some period of time, they determinedwell, Medicare determined that she didn't have any more money that they would pay out, so the hospital tripled the bill. This isthere's no statutory scheme that gives them the right to do that. They don't havethey didn't come to Mrs. Malone and say, oh, Mrs. Malone, your Medicaid ran out. You have an option of moving out of the hospital now, but if you don't, I want you to know that the room is going from two hundred dollars a day to six hundred dollars a day, or something to that effect.
This woman was in the hospital for a number of days. They thought they were billing fifty-six hundred dollars. They billed fifty-six hundred dollars. They didn't get it. They must be thrilled to death that she ran out of paymentsthat she ran out of money through Medicaid. There is no conscionable way they can just take and triple the bill and say that's our usual customary fee. That's like someone coming into my office for a pro bono case and you say, oh, I now discover you got money, I'm going to charge you whatever I please.
There's nonothing submitted on behalf of the plaintiff that says they have any right to do that. So my position is the usual and customary fee is what they anticipated they would be able to bill, not what they choose to bill after they find out that some provider is not paying. And I don't believe that was particularly and completely articulated in a prior argument.
In this particular circumstance, we agree with the estate's position. There is no evidence that the hospital alerted the decedent or her next-of-kin, her son John Malone, of any new billing practice or expectations if Mrs. Malone's Medicare benefits ran out before she died. The son's certification stated, in full:
1. I am the son of the deceased Mary Malone.
2. My mother received medical treatment at Burdette Tomlin Memorial Hospital at various times up and through December 5, 1999.
3. Her bills were all sent to medicaid.
4. No bills were ever sent to me or my mother and they were all handled in that fashion.
5. The last bill sent to medicaid requested payment in the amount of $5,659.72 as full and final payment for all services rendered to Mary Malone.
6. When medicaid denied said payment and advised that Mary Malone's medical benefits were exhausted, the hospital then billed the Estate and me individually the sum of $18,472.76 for the same services.
7. Through my attorney, I offered to pay the initial bill as full and final settlement of all claims Burdette Tomlin may have against the Estate of Mary Malone or myself. That request has been denied.
We are inclined to adopt the view of the federal courts in a similar case, Vencor, Inc. v. Standard Life and Accident Ins. Co., 65 F.Supp.2d 573 (W.D.Ky.1999), aff'd, 317 F.3d 629 (6th Cir.2003). In Vencor, the "Medigap" carrier, Standard Life, successfully made a similar argument to the contention advanced here by the estate, based on its contract language. The Sixth Circuit affirmed the District Court judge's ruling that Standard Life had to pay the unreimbursed amount only at "per diem rates allowed by Medicare, even after Medicare coverage ha[d] been exhausted," 317 F.3d at 631, not at the hospital's so-called "reasonable and customary rate" or "standard rates." *618 Judge Heyburn's language in his District Court opinion points to the problem precisely:
Allowing health care providers to charge any amount would create an apparent inconsistency. Such a ruling would expose many elderly or their estates to liability for the amount that the provider's rate exceeded the Medicare rate. Such a result runs counter to the whole purpose of supplemental Medicare insurance regulations. The goal of Medigap policies is to prevent the elderly from facing uncertain and possibly cost prohibitive medical expenses. If providers can charge any amount after the elderly exhaust Medicare benefits and supplemental insurers are not liable, this goal is thwarted and the implicit promise of Medigap policy is made illusory.
Legislation requiring Medigap insurers to write policies covering any amount charged by providers for eligible care could solve this problem. However, neither Congress nor the Tennessee state legislature has chosen to mandate this. One reason may be that to do so would cause the cost of supplemental insurance policies to increase dramatically, likely pricing many elderly out of the supplemental insurance market altogether. This result also appears at odds with the purpose and goals of the current Medicare structure, to ensure that the elderly have access to necessary health care.
The Court is confronted with a complex legislative scheme involving many delicate policy choices. Though complex, the legislative scheme may not resolve every important question. For the time being, the Court finds it unnecessary to inquire whether there is sufficiently strong evidence of legislative intent to fairly resolve these problems. To do so might require the Court to adopt its own policy and write its own amendments. No doubt a legislature pronouncement would provide the most appropriate resolution of how much providers may charge after the elderly exhaust Medicare benefits.
Whether Vencor can charge its customary rates is not an issue requiring resolution in the breach of contract claim. It seems unlikely to be relevant in the context of Vencor's promissory estoppel claim either. If the only representation made by Standard Life was submission of the insurance policy, then Vencor will lose on the promissory estoppel claim. If Standard Life made some other representation to Vencor, it is conceivable that Vencor may have a viable claim, but Vencor must establish that an injustice would result from receiving its Medicare rate. See Amacher v. Brown-Forman Corporation, 826 S.W.2d 480 (Tenn.App. 1991) (promissory estoppel is only appropriate when necessary to avoid injustice).
[65 F.Supp.2d at 579-80.]
We perceive no injustice in limiting the Hospital to recovery of the Medicare rate in this situation where benefits ran out during decedent's terminal illness hospitalization and no new arrangements had been made with decedent or her next-of-kin as to increases in billings thereafter. We think the equities require the invocation of the doctrine of "quasi-estoppel" described by our Supreme Court in Heuer v. Heuer, 152 N.J. 226, 704 A.2d 913 (1998):
There are two basic forms of estoppel. "True estoppel" is used to define the situation in which "`one party induces another to rely on his [or her] damage upon certain representations.'" Kazin, supra, 81 N.J. at 94, 405 A.2d 360 (quoting Restatement (Second) of Conflict of Laws § 74, cmt. b (1971)). "Quasi-estoppel" describes a situation in which "an individual is not permitted to `blow *619 both hot and cold,' taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person has actually relied thereon." Ibid. (quoting Brown v. Brown, 274 Cal.App.2d 178, 82 Cal.Rptr. 238, 244-45 (1969)).
[Heuer, 152 N.J. at 237, 704 A.2d 913.]
The doctrine "is discretionary on the part of a court." Id. at 238, 704 A.2d 913. "It is a doctrine designed to prevent a party's disavowal of previous conduct if such repudiation `would not be responsive to the demands of justice and good conscience.'" Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339, 403 A.2d 880 (1979) (quoting West Jersey Title & Guaranty Co. v. Indus. Trust Co., 27 N.J. 144, 153, 141 A.2d 782 (1958)). West Jersey Title described the doctrine as follows:
Estoppel in pais is a preclusion by law against speaking contrary to one's own act or deed; one may not take a position inconsistent with that previously assumed and intended to influence the conduct of another, if such repudiation "would not be responsive to the demands of justice and good conscience," in that it would work prejudice and injury to the other. New Jersey Suburban Water Co. v. Harrison, supra [, 122 N.J.L. 189, 3 A.2d 623 (E. & A.1939)].
[27 N.J. at 153, 141 A.2d 782.]
For these reasons, we conclude that the Hospital is entitled to no more than the Medicare reimbursement rate from the estate. We affirm but modify the judgment in favor of the plaintiff Hospital to the sum of $5,659.72 without prejudgment interest.
Affirmed, as modified, and remanded for entry of appropriate judgment.