**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0544n.06

No. 08-6545

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PACE INDUSTRY UNION-MANAGEMENT PENSION FUND, and its Trustees; BOYD YOUNG; DONALD L. LANGHAM; ROGER HEISER; GARY COOK; JAMES PANNELL; JAMES CARMICHAEL; SUSAN STAUDUHAR; RON HACKNEY; DALE OLSON; DALTON J. BABINEAUX, | ) ) ) ) ) ) ) | **ON APPEAL** FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| Plaintiffs-Appellees, | ) ) | **O P I N I O N** |
| v. | ) ) | |
| DANNEX MANUFACTURING CO., INC.; ANNEX MANUFACTURING; ALAN FUNK, | ) ) ) ) | **FILED Aug 26, 2010** LEONARD GREEN, Clerk |
| Defendants-Appellants. | ) | |

BEFORE: COLE, GILMAN, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Dannex Manufacturing Co., Inc. ("Dannex"), Annex Manufacturing Co., Inc. ("Annex"), and Alan Funk ("Funk"), appeal the district court's grant of summary judgment to the PACE Industry Union-Management Pension Fund ("Fund") in this action to recover delinquent contributions to the Fund from Dannex as employer, and Annex and Funk on theories of vicarious responsibility and fraudulent transfer. We **AFFIRM**.

_____**I. Background**

**A. Dannex Acquires Annex**

Annex was founded in the early part of the twentieth century by Funk's grandfather. Until the 1960s, it produced satin linings for men's hats. After a decline in the men's hat business, Annex

turned to cutting, sewing and selling satin inserts for watch and jewelry boxes, embossing paper sheets printed by its customers, and selling satin for use as box lining. Funk was Annex's president and sole shareholder.

In the summer of 1997, Funk and three other persons formed Dannex. They provided the capital for Dannex to purchase the equipment, assets, and business of Dane Paper Board Cartons, Inc. ("Dane"). Dannex also acquired most of Annex's business. Funk was an 85% shareholder of Dannex and became its president. He remained Annex's sole executive, shareholder and full-time employee. Dannex continued Dane's line of business, the manufacture of folding boxes used for packaging retail goods, along with the business acquired from Annex, the sale of satin, satin piece goods, and embossed paper products. Funk negotiated Dannex's collective bargaining agreements with its union members and was at the top of the chain of command among Dannex's employees. Many of Dane's former employees continued to work at Dannex.

Annex's entire business after 1997 was as a broker buying and then selling satin to companies located in Asia, and Funk claims he kept Annex in existence because Annex's purchasers in Asia were familiar with the name. Funk claims that Annex bought satin from Dannex at arm's length and later sold it. Dannex then billed Annex for 85-90% of the sales price, and Annex retained 10-15% as sales commission. Funk claims that these sales were invoiced to customers by Annex. As the district court noted, however,

> Annex's tax returns demonstrate substantial inconsistency in terms of the amount
> paid to Dannex for the cost of the goods sold by Annex. For instance, Annex's 2000
> tax return reflects that Annex's cost of goods purchased was approximately ninety

percent of its gross receipts; the cost in 2001 was eighty-four percent; in 2002, seventy-one percent. In 2003, 2004 and 2005, Annex reported no cost of goods at all but reported sales in the amount of $149,320, $113,767 and $39,431, respectively.

Annex conducted its business primarily through Dannex employees; a Dannex employee in the shipping department would respond to an order for satin from Annex by wrapping the satin in shrink wrap and sending it to the ultimate customer. The accountant for Funk, Annex, and Dannex stated that "towards the end" Annex and Dannex were not carrying out arm's length transactions.

Although Funk was Dannex's president and was actively involved in its operations, Funk never received a salary from Dannex, but he received a salary from Annex through 2005. His father, Morty Funk, may also have drawn a small salary from Annex from 1999 through 2005, although he lived mostly in Florida and performed no work for Annex. Annex owned the property at which Morty Funk resided in Florida until Annex sold the property to him in 2005, and Annex owned a car that Morty Funk drove while living in Florida.

In addition to the tax discrepancies described above, there were other indications that the Defendants' financial dealings with each other were inconsistent with Annex and Dannex being truly distinct businesses. Shortly after its formation, Dannex began leasing Annex's equipment at the rate of $12,500 per month. It did so for ten years, ultimately paying more than $1 million from 1997 through 2005. The payments were classified as "administrative charges" and "administrative income" on Dannex and Annex's respective tax returns, rather than as equipment lease payments or receipts, and Funk described the lease as "informal." Dannex also paid for all maintenance and repair of Annex's equipment from 1997 through 2005, and had an option to purchase the equipment

at fair market value at the end of the lease but did not do so. In December 2005, Dannex conducted a liquidation sale of its assets, and included the equipment it leased from Annex, providing a warranty asserting that it held title to all of the equipment sold. Despite the sums Dannex paid in rental and maintenance on the equipment over the years, Dannex's 2005 tax return lists the proceeds from the liquidation sale as only $225,000.[1]

The record also reveals other inconsistencies in Defendants' financial dealings and bookkeeping. Dannex was a Subchapter S corporation for federal income tax purposes and, as such, liability for taxes on corporate profits should have been paid proportionally by the shareholders.[2] In 2000 and 2001, Funk received payments from Dannex totaling $280,687. Although Funk characterizes the payments as shareholder distributions from which he paid his share of Dannex's taxes, the payments were designated as loans on Dannex's tax returns. In 2005, as a result of the Internal Revenue Service (IRS) auditing Dannex, Dannex's accountant, Peter Canter ("Canter"), sent promissory notes to Funk for his signature in order to substantiate the identification of the payments as loans. Funk signed the promissory notes memorializing his obligation to repay the $280,687, which were backdated to 2000 and 2001, and Canter submitted them to the IRS. Funk never paid

---

[1]Funk claims that that number does not reflect the full amount received for the equipment because additional sales were made in 2006, but provides no evidentiary support for this position.

[2]Under 26 U.S.C. § 1366, Subchapter S Corporations do not pay taxes themselves. Instead, "[e]ach shareholder of an S corporation . . . pays taxes at individual rates on the pro rata share of the corporation's income (if there is any) and receives the pro rata tax benefits (*e.g.,* losses, deductions and credits) of the corporation." *Maloof v. C.I.R.*, 456 F.3d 645, 647 (6th Cir. 2006).

interest on these loans, however, and apparently had no expectation of actually repaying the money to Dannex. Canter stated that "[w]e treated it as a loan just to avoid the tax, but they were not loans."

Additionally, since 2002, Annex has reported on its tax returns over $3 million in outstanding loans owed to Annex by Funk.[3] A portion of the loans from Annex to Funk arose in November 2002 when Annex received in excess of $2 million from the pay-off of a mortgage it held. Funk and Annex were general partners in the entity that owned the mortgage. Funk, as general partner in the entity and the sole shareholder in Annex, had the $2,000,000 transferred from Annex's account to his personal account, and characterized the sum as a "loan" from Annex to him and reported the amount as a loan on Annex's tax returns. A few days later, on November 19, 2002, Funk issued from his personal bank account a payment to Dannex in the amount of $2,000,000, which he also characterized as a loan, although the loan was not, at that point, documented by a promissory note or any other writing. Dannex used the loan proceeds to pay down a secured loan held by the Trust Company of New Jersey from approximately $2,500,000 to approximately $500,000. Dannex had borrowed the money from the Trust Company of New Jersey in October 2001 for the purpose of acquiring the assets of another company.

---

[3]This sum is the result of a shareholder loan to Funk from Annex in the amount of $2,294,232, and an employee loan to Funk from Annex in the amount of $1,147,184. Funk has never paid interest on these loans either.

In June 2004, Dannex obtained an operating line of credit for more than $1 million from Medallion Business Credit, L.L.C. ("Medallion"). The collateral used to secure the 2004 line of credit included the equipment owned by Dannex and Annex. Medallion also required a personal guarantee from Funk. In late 2003, just before Dannex took out the line of credit with Medallion, Funk communicated to Canter his plan to take a junior security interest in Dannex's assets to secure the $2 million loan that he had made in 2002. In December 2003, Funk and Dannex executed a promissory note relating to that loan, as well as a security agreement giving Funk a lien junior to Medallion's in Dannex's inventory, equipment, accounts receivable, and other assets. Funk perfected that security interest by filing a U.C.C. Financing Statement with the New Jersey Secretary of State on January 12, 2004.[4] According to Funk, between January 2004 and October 2006 (by which time Dannex was no longer doing business), Dannex repaid him approximately $1,000,000 of the $2,000,000 he had loaned Dannex. Funk claimed that the money was repaid "by way of checks issued to [Funk] or to American Express for [his] entertainment expenses."

Another irregularity in Dannex's and Annex's finances is exhibited in the amounts reported by both companies as "entertainment" expenses on their tax returns, which the Fund's expert accounting witness stated were "as high as I have ever seen on a business of this size."[5] Funk could

---

[4]New Jersey's U.C.C. Financing Statements system gives public notice of the debtor and secured party relationship, and the collateral involved.

[5]As the district court summarized:
In 2000 Dannex's entertainment expenses were $78,572; Annex's entertainment expenses were $85,124, despite the fact that Funk was Annex's only employee and

not specifically explain what the entertainment expenses consisted of, but he believed the expenses likely included purchases made by individuals with corporate credit cards, including, in Annex's case, himself and his father. Funk testified that Dannex had no formal controls to ensure that individuals did not use corporate credit cards for personal expenses. In 2006, after Annex had ceased operations, Funk charged over $12,000 on Annex's corporate credit card and paid off the credit card with company assets.

Dannex closed in January 2006 and it has no remaining assets.

**B.  The Fund**

The Fund is a multi-employer employee benefit plan administered out of Nashville, Tennessee. Participants in the Fund receive pension benefits on retirement, the value of which is determined by the amount of pension credits earned by participants based upon the number of hours and years worked prior to retirement and according to the applicable benefit level in effect at the time. The Fund fulfills these obligations by collecting monthly contributions from employers based on the hours worked by participants. The Fund determines what level of benefit can be provided for the contribution level agreed to by the employer in the applicable collective bargaining agreements

---

Annex reported only $79,041 in net sales. In 2001, Dannex's entertainment expenses were $115,988; Annex's were $72,518. In 2002 (the year Dannex lost approximately $500,000), Dannex's entertainment expenses were $175,572; Annex's were $62,789. In 2003, Dannex's entertainment expenses were $231,369; Annex's were $15,619[.] In 2004 Dannex's entertainment expenses were $119,750; Annex's were $38,969. In 2005, Dannex's entertainment expenses were $66,560; Annex's were $95,696.

with the union and participation agreements with the Fund, under which employers are obligated to make payments.

Prior to its purchase by Dannex, Dane had participated in the Fund since 1981. After Dane was purchased by Dannex, two unions were represented at Dannex, the Union of Needletrades, Industrial and Textile Employees ("UNITE"), and the United Paperworkers International Union ("UPIU"). The UPIU was the predecessor to the Paper, Allied-Industrial, Chemical and Energy Workers International Union ("PACE"). Only UPIU/PACE union members were covered by the Fund.

In June 1997, Clarice St. Luce ("St. Luce"), then President of PACE Local 1-300, AFL-CIO ("Local 300"), which represented Dannex's PACE employees, informed the Fund by letter that Dane was closing and selling its assets to Dannex. St. Luce also informed the Fund that Dannex was planning to join the Fund as a contributing employer pursuant to the collective bargaining agreement between Dannex and Local 300 that was to go into effect on August 1, 1997. St. Luce therefore requested that the Fund provide a cost calculation of what the contribution rate would be for Dannex's employees. The Fund completed a cost calculation for Dannex in June 1997 and, based on that calculation, prepared a Standard Form of Participation Agreement ("SFA") that provided for Dannex's participation in the Fund beginning August 1, 1997. The Fund sent the SFA to St. Luce to be executed by her for the Local 300 and by Dannex's management. That SFA was not executed or returned to the Fund in 1997 or 1998. As a result, the Fund did not enroll any Dannex employees as participants in the Fund or attempt to collect contributions from Dannex during that period.

Dannex and Local 300 did, however, enter into a Collective Bargaining Agreement ("CBA"), effective from August 1, 1997 through July 31, 2001. That CBA provided for a $0.346 per hour rate of contribution to the Fund, up to forty hours per week per covered employee, to increase to $0.392 per covered hour beginning August 1999. Funk does not dispute that those amounts were never paid to the Fund.

On January 12, 2000, St. Luce forwarded to the Fund two fully-executed copies of the SFA, signed by St. Luce on behalf of Local 300 and Funk on behalf of Dannex, providing for Dannex's participation in the Fund effective August 1997. The SFA required Dannex to make contributions on behalf of "all individuals performing work covered by the collective bargaining agreement, including probationary, temporary, and part-time employees, except for those individuals in the employ of the Employer for a period of less than sixty (60) calendar days." Nonetheless, Dannex did not begin making the required contributions to the Fund at this time either. The Fund contends that when it contacted St. Luce to inquire why Dannex was not making contributions, she informed the Fund that Dannex had changed its mind, and told the Fund not to pursue the delinquency.

Despite the fact that Dannex had not been making contributions to the Fund, and allegedly unbeknownst to the Fund, St. Luce and Dannex entered into a second CBA that also provided for payments to the Fund. That CBA went into effect on August 1, 2001, and continued through December 31, 2005, and provided for contributions at the rate of $.392 per hour, as well as "two additional units for the covered employees" effective January 1, 2004. Funk admits that no payments

were made to the Fund over the period covered by this CBA either. The Fund claims it was unaware of Dannex's obligations under the CBAs to contribute to the Fund.

Toward the end of 2004 or early 2005, the United Steelworkers International Union[6] began investigating Local 300 and St. Luce for gross mismanagement and, as a result, the Fund became aware that Dannex's employees believed both that they were participants in the Fund and that Dannex had been contributing to the Fund on their behalf.[7] The Fund determined that, based on the CBAs and SFAs between Local 300 and Dannex, Dannex had an obligation beginning in 1997 to contribute to the Fund, and that Dannex employees were, in fact, entitled to pension credits for the entire period of their employment with Dannex.

The Fund's auditor, Bond Beebe Accountants & Advisors ("Bond Beebe"), conducted an audit of Dannex to determine the amount of delinquent contributions. Phillip Vivirito ("Vivirito"), Director of Compliance Audits with Bond Beebe, visited Funk's home on August 23, 2006, where Dannex's records were kept. The Dannex documents, purportedly including Dannex's employment records, were contained in approximately 100 unlabeled, unorganized boxes in Funk's basement, and Funk was unable to provide guidance as to where in the boxes the relevant documents might be

---

[6]In January 2005, the PACE International Union completed a merger with the United Steelworkers International Union.

[7]In February 2005, the United Steelworkers International Union placed Local 300 into a Trusteeship. The United States Department of Justice also began investigating Local 300, leading to the indictment and prosecution of St. Luce and her son, who administered the Local 300 Health Fund. On November 8, 2007, St. Luce signed a plea agreement under which she agreed to plead guilty to embezzling from Local 300.

found.  Funk and Vivirito therefore agreed that it would be more efficient for Vivirito to obtain records from Automated Data Processing, Inc. ("ADP"), Dannex's payroll company.  Although Vivirito requested that ADP provide both Master Control Schedules and W-2 statements for the Dannex employees, he was able to obtain only the latter because that was all that ADP had retained.  Because "[n]o payroll records, job classifications, or hire and termination dates were available for audit purposes," Vivirito had to deduce what information he could from the W-2 forms.[8]

Vivirito determined that the total amount of contributions owed by Dannex from January 1999 through December 2005 was $382,257.16, plus interest on the unpaid contributions in the amount of $34,964.50 as of the date of the audit.  The ERISA liquidated damages provision of 20% of past-due contributions[9] amounted to $76,451.43.  Pursuant to the SFA, Dannex was also

---

[8]Vivirito calculated payroll hours by dividing the employees' year-end wages by the lowest wage rate on the Wage Schedule in the CBA ($7.24 in 1999 and $7.64 from 2001-2005).  Any employee whose year-end payroll hours were calculated to be less than 320 hours was not included in the report because Vivirito assumed that he or she was employed for less than sixty days, and thus that he or she was excluded under the terms of the SFA.

[9]Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2)(C)(ii) states:

In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan . . . liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the [unpaid] amount . . . .

responsible for the cost of the audit, which was $5,400.  The Fund therefore requested $499,073.09 plus attorney's fees.[10]

## C.  Procedural History

The Fund and its trustees[11] brought this action under Section 502 of ERISA, 29 U.S.C. § 1132, and Section 301 of the Labor Management Relations Act of 1948, 29 U.S.C. § 185, against Defendants to obtain the contributions allegedly owed to the former employees of Dannex.  On May 28, 2008, the Fund filed separate motions for summary judgment against Dannex, Annex, and Funk. The Fund claimed that Dannex was liable to it for delinquent contributions, interest, liquidated damages, and attorneys' fees;  that Annex was liable for these same damages because Dannex and Annex were a "single integrated employer[] under federal labor law," and were alter egos; and that Funk was liable for the damages because he had an outstanding loan he owed to Dannex in the amount of $280,687, he had another outstanding loan he owed to Annex in the amount of over $2 million, Funk and Annex were alter egos, and the security interest that Funk took in 2004 in Dannex's equipment was a fraudulent transfer under New Jersey law.

Defendants filed a joint reply and cross-motion for summary judgment.  Dannex claimed that the Fund was not entitled to collect against it due to waiver and laches, and that the audit had errors

---

[10] Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2)(D), states that "the court shall award the plan . . . reasonable attorney's fees and costs of the action, to be paid by the defendant."

[11] The Fund's Board of Trustees is the named fiduciary of the Fund and therefore is a fiduciary within the meaning of Section 3(21)A of ERISA, 29 U.S.C. § 1002(21)(A).

that resulted in overstated delinquent contributions. Annex claimed that it could not be held liable because it was not an alter ego of Dannex. Funk claimed that he was not liable because: (1) the $280,687 amount that he obtained from Dannex was not a loan, but instead was a shareholder distribution; (2) Funk should not be punished for attempting to assist Annex and Dannex financially; and, (3) the only claim against Funk in the Fund's Second Amended Complaint was for a fraudulent transfer, and therefore the Fund was barred from bringing additional claims against Funk on summary judgment.

On November 12, 2008, the district court entered its opinion granting the Fund's motions for summary judgment. It first considered the Fund's claim of liability against Dannex for delinquent contributions. The district court ruled: (1) Dannex's waiver defense was preempted under ERISA; (2) Dannex's laches defense was likely preempted under ERISA and, regardless, failed under the facts; and, (3) Dannex had not sufficiently supported its claim of error in the audit to create an issue of material fact.

The district court next considered the arguments of Annex and Funk. The court first found that Funk had sufficient notice of all of the Fund's claims, and therefore all of the claims were properly before the court. Next, the court found that Dannex and Annex did not qualify as alter egos under the more "relaxed" labor law standard, but did qualify as alter egos under the traditional federal common law standard, which applies to the present case. The district court then found that Funk was liable to the Fund as a result of the outstanding shareholder loan from Annex to him in the amount of $2,294,232. The court also found that Funk was estopped from asserting that the

$280,687 he received from Dannex was a shareholder distribution instead of a loan. Finally, the district court held that Funk had violated the New Jersey Fraudulent Transfer Act such that he was individually liable to the Fund.

Therefore, the district court granted all three of the Fund's motions for summary judgment and denied Defendants' motion for summary judgment. The district court entered judgment in favor of the fund for $501,698.27[12], plus attorneys' fees and costs in the amount of $116,143.62. Defendants timely appealed.

## II. Analysis

We review a grant of summary judgment *de novo. Little v. BP Exploration & Oil Co.,* 265 F.3d 357, 361 (6th Cir. 2001).

### A. Laches

Defendants argue that they were prejudiced by the Fund's failure pursue collection of the fees, and that therefore the Fund should be barred by laches from now pursing collection from Defendants.

"A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 493 (6th Cir. 2007). "[L]aches focuses on the inexcusable delay after

---

[12]Including delinquent pension fund contributions of $382,257.16, updated interest in the amount of $37,589.68, statutory liquidated damages of $76,451.43, and $5,400 for the cost of the audit.

possession of the knowledge of the facts . . . ." *Wells v. U.S. Steel & Carnegie Pension Fund, Inc.,* 950 F.2d 1244, 1250 (6th Cir. 1991) (internal quotation marks omitted). Under New Jersey law, a party must demonstrate "substantial reliance, to his or her detriment, on the other party's delay in asserting a right to relief." *Brocken v. Brocken,* No. FM-07-1354-06, 2010 WL 153300, at *5 (N.J. Super. Ct. Ch. Div. January 19, 2010) (unpublished decision) (citing *Lavin v. Bd. of Educ. of Hackensack,* 447 A.2d 516, 520 (N.J. 1982)).

Here, there was a substantial delay from the time the Fund received the signed SFAs until it brought its first complaint in this matter. Nevertheless, we affirm the district court's holding denying Defendants' claim of laches against the Fund. Laches is an equitable doctrine and is not available to those who do not come with "clean hands." *See, e.g., Borough of Princeton v. Bd. of Chosen Freeholders of County of Mercer,* 777 A.2d 19, 32 (N.J. 2001) (The concept of "clean hands" "[i]n simple parlance . . . merely gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit."). Defendants have hardly shown clean hands.

Additionally, the application of laches relies in part on an *unexplained* delay. *See Lavin,* 447 A.2d at 519 ("Laches in a general sense is the neglect, for an unreasonable *and unexplained* length of time, under circumstances permitting diligence, to do what in law should have been done." (emphasis added)); *see also Topping v. Jams Assocs.,* No. L-171-03, 2006 WL 2787158, at *4 (N.J. Super. Ct. Law Div. Sept. 29, 2006) ("Whether a delay is unreasonable is fact sensitive and depends upon all the circumstances."). Here, the Fund has offered an explanation for its delay—as part of

a larger fraud that was ultimately prosecuted by the federal government, St. Luce deceived the Fund as to Dannex's obligations and intentions. Although defendants contest the veracity of the Fund's claim that St. Luce instructed the Fund not to pursue the delinquent payments, they do not provide evidence to the contrary.

Laches is an equitable doctrine, and as such it is not intended to support an inequitable result. *Linek v. Korbeil,* 755 A.2d 1229, 1235 (N.J. Super. Ct. App. Div. 2000). Under these circumstances, we agree with the district court's determination that laches does not apply.

## B.  The Audit

As described above, Vivirito's audit utilized W-2 forms to calculate Dannex's contribution delinquencies because Dannex's employment records, assuming they are somewhere among the papers in Funk's basement, were too difficult to locate. On July 11, 2008, Funk filed an affidavit, in which he criticized the audit's accuracy on various grounds. Vivirito responded to Funk's criticisms in his own affidavit on August 5, 2008, rebutting Funk's claims of audit error. On September 5, 2008, Funk submitted a supplemental affidavit, in which he again criticized the audit, repeating some of his earlier claims and arguing that he was not made aware until too late that Vivirito was unable to obtain all of the necessary information from ADP. The district court held that Defendants had not succeeded in demonstrating a material issue of fact in regard to the amount of the damages found by the audit.

On appeal, Funk reiterates the various claims of inaccuracy that he raised in the district court.[13] He also argues that he was under the impression that Vivirito had obtained all the documents needed from ADP in order to conduct the audit, and that the Fund had never contacted Funk or his attorneys to inform him otherwise. Funk claims that he did not learn that certain records were not available from ADP until he saw Vivirito's August 5, 2008 affidavit.

We need not determine whether the inaccuracies that Defendants allege in the methodology of the audit are supported or relevant. ERISA requires that "every employer shall . . . maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1). Where this is not done, "ERISA shifts the burden to the employer to produce evidence of the amount of work performed and to rebut reasonable inferences that can be drawn from the plaintiff's evidence." *Trs. of Painters Union Deposit Fund v. Ybarra Constr. Co.,* 113 F. App'x 664, 667-68 (6th Cir. 2004) (citing *Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.,* 30 F.3d 692, 695 (6th Cir. 1994)).

Dannex did not keep its employment records in an accessible format, and never came forward with evidence to rebut the audit's calculations (e.g., by producing the records that are purportedly in Funk's basement, providing expert testimony criticizing the audit's methodology, or offering an alternative calculation). Instead, Dannex relies on unsupported claims of inaccuracy. These are

---

[13]Defendants' argument on appeal relates only to the calculation of delinquent contributions and, presumably, the proportional liquidated damages under ERISA. They do not challenge the amount of attorneys' fees or the cost for the audit.

insufficient to create a material issue of fact. *See Trs. of Painters Union,* 113 F. App'x at 668 ("The company did not come forward with additional records to substantiate its arguments that . . . the hours at issue should have been calculated using [a different] rate, that certain employees should not have been included in the computation, or that the total number of hours was too high. The results of the audit should be presumed accurate, since no contradictory evidence was produced by [the employer]." (internal footnote omitted)); *Trs. of Detroit Carpenters Health & Welfare Fund v. River City Constr.*, 99 F. App'x 612, 614-15 (6th Cir. 2004) (in the absence of proof from the employer regarding the accurate amount, "the auditor's report is sufficient proof of the contributions owed to warrant summary judgment"); *Bds. of Trs. of Ohio Laborers' Fringe Benefit Programs v. Jenkins,* 283 F. App'x 315, 319 (6th Cir. 2008) (holding that a party may not rely on records within its sole control that have not been made part of the record in the case to create a genuine issue of material fact).

Further, even if the Fund did not communicate to Defendants prior to the submission of the audit that they were unable to obtain all of the expected documents from ADP, the audit itself, first submitted to the court in May 2008, described the methodology used and makes clear that "[n]o payroll records, job classifications, or hire and termination dates were available for audit purposes" and that, "[d]ue to the absence of job classifications, the auditor assumed all employees receiving W-2s were to be reported." The district court did not enter summary judgment until November 2008, but in the intervening months Defendants did not submit any evidence refuting the audit or produce the payroll documents.

Therefore, Defendants have not established a material issue of fact regarding the accuracy of the audit, and we find no error. Thus, summary judgment against Dannex, the employer, was proper.

## C. Annex's Liability as an Alter Ego of Dannex

The district court held that Dannex and Annex were alter egos under the "traditional" federal common-law standard, a finding that Annex challenges on appeal. Whether alter ego liability applies in ERISA actions is a question of federal common law. *Flynn v. Greg Anthony Constr. Co., Inc.,* 95 F. App'x 726, 732 (6th Cir. 2003); *see also NLRB v. Fullerton Transfer & Storage, Ltd., Inc.,* 910 F.2d 331, 335 (6th Cir. 1990) ("Whether a company or individual is responsible for the financial obligations of another company or individual is a question of federal law when it arises in the context of a federal labor dispute."). Although under the federal common law "there is no one test that governs when one corporation will be found to be the alter ego of another," *id.* at 339, this Circuit has found guidance in the Supreme Court's statement that

> as Mr. Justice Cardozo said in *Berkey v. Third Avenue R. Co.*, 244 N.Y. 84, 95 155 N.E. 58, 61 "Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice." That is not a complete catalogue. The several companies may be represented as one. Apart from that is the question whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities. One company may in fact be operated as a division of another; one may be only a shell, inadequately financed; the affairs of the group may be so intermingled that no distinct corporate lines are maintained. These are some, though by no means all, of the relevant considerations as the authorities recognize.

*Id.* (quoting *N.L.R.B. v. Deena Artware, Inc.*, 361 U.S. 398, 403-04 (1960)). This Circuit has also looked to whether one corporation "could not have operated in the same fashion without the aid of" the second corporation. *Id.*

We affirm the district court's finding that Annex was an alter ego of Dannex. In *Federated Dept. Stores, Inc. v. J.V.B. Indus., Inc.,* 894 F.2d 862, 870 (6th Cir. 1990), we held that two corporations were alter egos where: (1) they were both controlled by the same individual; (2) one was a "mere instrumentality" of the other; and, (3) one corporation "provided all the equipment, labor and management" for the other. As the factual record here shows, both Dannex and Annex were controlled by Funk, who was the sole shareholder of the latter and was 85% shareholder of the former. Further, Annex was a "mere instrument" of Dannex; by Funk's own admission, Annex was kept in business only because the name was familiar to some customers, and almost all of the labor, and all of the equipment, necessary for any sales that Annex made were provided by Dannex. Dannex also sold Annex's equipment as if it were Dannex's own, and their respective tax returns are inconsistent with businesses operating independently of one another. Indeed, even Defendants' accountant admitted that eventually the two companies ceased to operate at arm's length. Because Annex has not demonstrated a material issue of fact regarding Annex's operation as an independent business entity, we affirm the district court on this issue.

**D. Funk's Liability**

**1. The Outstanding Loan From Annex to Funk**

The district court held that because Annex is liable as an alter ego of Dannex, and it is undisputed that there is an outstanding shareholder loan from Annex to Funk of over $2,200,000, Funk is indirectly responsible for the same liabilities on the basis of the outstanding loan. Funk does not address this aspect of the district court's opinion on appeal. Instead, he challenges the court's conclusion that Annex and Dannex were alter egos, discussed above, and asserts that the Fund's position as creditor of Dannex/Annex does not give it a priority position over other creditors of Funk. But the district court did not find that the Fund was in a priority position, only that Funk could be held personally liable to the extent of his debt to Annex.

**2. The $280,687 Payment From Dannex to Funk - Estoppel**

The district court found that Funk was estopped from arguing that the $280,687 paid to him by Dannex was a shareholder distribution rather than a loan, because Dannex had claimed the amounts as loans on its tax returns and Funk had signed promissory notes in 2005 backdated to 2000 and 2001 to substantiate the amounts as loans. Funk admitted that he never paid interest on these amounts and stated there was no expectation that he do so.

The New Jersey Supreme Court has explained:[14]

> There are two basic forms of estoppel. "True estoppel" is used to define the situation in which one party induces another to rely to his [or her] damage upon certain representations. Quasi-estoppel" describes a situation in which an individual is not permitted to 'blow both hot and cold,' taking a position inconsistent with prior

---

[14]Neither of the parties nor the district court addressed choice-of-law concerns, but all applied New Jersey state law where necessary. We will therefore do so as well.

> conduct, if this would injure another, regardless of whether that person has actually relied thereon.

*Heuer v. Heuer*, 704 A.2d 913, 918 (N.J. 1998) (internal citations and some internal quotation marks omitted); *see also Burdette Tomlin Mem'l Hosp. v. Estate of Malone*, 845 A.2d 615 (N.J. Super. Ct. App. Div. 2003) (applying the doctrine of quasi-estoppel against a hospital where it billed Medicare at one rate and then attempted to triple the charges when it learned that the patient's Medicare coverage had expired). "The party seeking to invoke the doctrine has the burden of proving that the other party should be estopped." *Heuer,* 704 A.2d at 919.

Funk represented the receipt as a loan and not a distribution, and took the benefit of that position with the IRS. He caused Dannex to claim the payment as a loan and he signed forms to demonstrate to the IRS that it qualified as a loan. Funk has submitted no evidence showing he paid taxes on the funds. Instead, he seeks to blame his accountant and argues that "it would be illogical for the distributions to be considered true loans." This contention is insufficient to establish a material factual dispute, and therefore we affirm the district court's holding that Funk is estopped from arguing that the amounts were not loans. Funk argues in this context as well that his status as a debtor of Dannex and the Fund's status as a judgment creditor of Dannex do not join together to place the Fund in a position of priority over Funk's other creditors. Again, the court did not so hold.

**3. Fraudulent Transfer**

The district court held that Funk, in causing Dannex to grant him a security interest in Dannex's assets in December 2003, which he perfected in January 2004, committed a fraudulent

transfer under the New Jersey Uniform Fraudulent Transfer Act ("NJUFTA"), N.J. Stat. Ann. §§ 25:2-20 to 25:2-34 (1997).[15]

On appeal, Funk asserts multiple claims of error regarding the district court's finding of fraudulent transfer, most, if not all, of which were waived by his failure to raise them below. *Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2008) ("[T]he failure to present an issue to the district court forfeits the right to have the argument addressed on appeal."); *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) ("It is well-settled that this court's function is to review the case presented to the district court, rather than a better case fashioned after an unfavorable order." (internal quotation marks, brackets, and ellipses omitted)). In any event, we need not address this basis for the district court's decision because Funk's debt to Annex more than covers the amount by which the Fund's judgment exceeds Funk's debt to Dannex.

Based on the foregoing, we **AFFIRM** the judgment of the district court.

---

[15]The Fund claimed that Funk committed a fraudulent transfer under three of the definitions in the NJUFTA. Although the three definitions have different elements, and the district court did not specify which of the definitions it found applicable, under the district court's factual findings all three were satisfied.